**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ANDREA D. LOGUIDICE,

                    Plaintiff,

        v.                                           1:14-CV-1323
                                                  (TJM/CFH)

EDWARD MCTIERNAN, STUART BRODY,
BENJAMIN CONLON, MARLINE AGNEW,
DEBORAH CHRISTIAN, PHIL LODICO,
MARC GERSTMAN, and JOHN DOES 1-5,

                    Defendants.

---

**APPEARANCES:**

**OF COUNSEL**:

BOIES SCHILLER & FLEXNER LLP
30 South Pearl St., 11th Fl.
Albany, New York 12207
Attorneys for Plaintiff

GEORGE F. CARPINELLO, ESQ.
JOHN F. DEW, ESQ.

NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, 11th Fl.
New York, New York 10017
Attorneys for Plaintiff

MICHAEL T. HAWRYLCHAK, ESQ.

NEW YORK STATE ATTORNEY GENERAL
The Capitol
Albany, New York 12224
Attorneys for Defendants

COLLEEN D. GALLIGAN, ESQ.
LOUIS JIM, ESQ.

## MEMORANDUM-DECISION AND ORDER

     Presently pending before the Court is plaintiff Andrea D. Loguidice's ("plaintiff")

motion to compel defendants to provide various testimony and documents that she

claims are not barred by the attorney-client privilege. Dkt. No. 41. Defendants Edward

McTiernan ("McTiernan"), Stuart Brody ("Brody"), Benjamin Conlon ("Conlon"), Marline

Agnew ("Agnew), Deborah Christian ("Christian"), Phil Lodico ("Lodico"), and Marc

Gerstman ("Gerstman") (collectively, "defendants," where appropriate) oppose the

motion. Dkt. No. 42. Nonparties the New York State Department of Environmental

Conservation ("DEC"), The Governor's Office on Employee Relations ("GOER"),

Maureen Coleman, and Ann Hohenstein (collectively, "non-parties," where appropriate),

also oppose. Dkt. No. 43. Plaintiff filed a reply. Dkt. No. 44. For the reasons that

follow, plaintiff's motion to compel is granted in part and denied in part.

## I. Background

### A. **Procedural Background**

As relevant here, on October 15, 2015, plaintiff filed a letter motion "request[ing]

the Court's assistance in resolving discovery disputes regarding communications

among Defendants about which Defendants have declined to testify at depositions on

the basis of privilege." Dkt. No. 27 at 1.[1] Plaintiff provided that defendants "repeatedly

asserted the attorney-client and work-product privileges as the basis for their refusal to

---

[1] As the discussion herein will reveal, the issues raised in the October 15, 2015 letter motion are encompassed within the November 13, 2015 motion to compel. See Dkt. Nos. 27, 41. Accordingly, a decision on this motion to compel necessarily addresses plaintiff's requests for relief in the letter motion. See id. The undersigned does note one exception. The October 2015 letter request specifically requests that the Court "reopen the deposition . . . of Conlon and Agnew," whereas plaintiff's motion to amend requests only that the Court "reopen the deposition of Conlon." Dkt. Nos. 27 at 8-9; 41-1 at 16-17. However, plaintiff's motion to amend does not address any claims with respect to defendant Agnew. See Dkt. No. 41-1. Notably, plaintiff's October 2015 letter motion also does not discuss defendant Agnew's deposition beyond indicating that Agnew was deposed on October 8, 2015 and that defense counsel invoked the attorney client privilege "to avoid answering questions about discussions concerning Plaintiff's termination. The transcript of [Agnew's] deposition have not yet been generated." See Dkt. No. 27 at 2 n.1-2. Plaintiff does not provide to the Court, either in the October 2015 letter motion or in the motion to compel, the specific questions that were asked of Agnew that she believes were improperly objected to as attorney-client privileged. See Dkt. Nos. 27, 41. Accordingly, any such request fo relief with respect to defendant Agnew is denied.

2

answer questions about virtually any substantive discussions had within the Department of Environmental Conservation ("DEC") regarding the decision to terminate Plaintiff from her employment at DEC." Id. Plaintiff argues that the conversations about which she sought to inquire were not privileged because: (1) "these discussions concern business activities within the DEC, not legal advice, and the discussions are therefore not privileged"; (2) "Defendants have waived their claim of privilege by asserting an affirmative defense that puts any legal advice they received regarding the decision to terminate Plaintiff at issue"; and (3) "Defendants have waived any privilege they might have had as to those discussions regarding the decision to terminate Plaintiff by producing documents that reveal portions of those discussions and/or the advice received." Id. Defendants requested a stay of depositions "pending resolution of these issues." Dkt. No. 28. Plaintiff joined the request to stay. Id. The Court granted the stay of depositions pending further Order of the Court. Dkt. No. 30.

On October 23, 2015, defendants responded to plaintiff's October 15, 2015 letter motion, Dkt. No. 27. Dkt. No. 32. Also on October 23, non-parties responded to plaintiff's October 15, 2015 letter motion. Dkt. No. 33. On October 27, 2015, plaintiff filed a reply to defendants' and nonparties' responses. Dkt. No. 37. Parties appeared before the undersigned for a conference. Text Min. Ent. dated Oct. 30, 2015. The undersigned set briefing deadlines for a motion to compel regarding the issues raised in plaintiff's October 15, 2015 letter motion and defendants' October 23, 2015 response. Dkt. No. 40. The discovery deadline and motion filing deadline were stayed pending a decision on the motion to compel. Id.

## B. Factual Background

The Court presumes the parties' familiarity with the facts of this case, and sets forth only those facts determined to be relevant in reviewing this motion. Plaintiff conducted a deposition of defendant Conlon on October 7 and October 8, 2015. Dkt. No. 41-2 at 1; Dkt. No. 41-3 at 2-26. On October 8, 2015, plaintiff conducted a deposition of defendant Lodico. Id. at 2. The parties refer to several documents provided during the discovery process. For ease of review during this Memorandum-Decision and Order, the Court will identify the documents attached to plaintiff's motion to compel.

### 1. Dkt. No. 41-3

Dkt. No. 41-3 is portions ofConlon's October 7, 2015 deposition.

### 2. Dkt. No. 41-4

Dkt. No. 41-4 is a memorandum from McTiernan, written to "File," dated August 5, 2014, titled Termination of Andrea Loguidice, with a header that reads "Not Subject to Foil." Dkt. No. 41-4. This memo, written on DEC letterhead, discusses how (1) plaintiff "received consulting from our Ethics Counsel (Stu Brody) about the important [sic] of avoiding any appearance of impropriety or otherwise creating any potential conflicts of interest" due to her "outside catering business"; (2) "Ben Conlon advised both me and Tom Berkman that the website maintained by Andrea's business contained an announcement that the business had recently catered an event for GE";

(3) Ben Colon and Phil Lodico interviewing plaintiff to "get her side of the story" on or about July 11, 2014, and their belief that plaintiff's denial of knowledge about the work for GE was not credible; (4) McTiernan's August 5, 2015 discussions/meetings with Maureen Coleman, Anne Hohenstein ("DEC's contact at GOER"), Lori Belgrade ("Personnel"), Marc Cadrette ("Personnel"), Marc Gerstman, and Mike Valforte ("the GC at GOER"), and McTiernan's statement that '[t]he advice I received was that this error in judgment was serious enough to warranted [sic] discipline in the case of a full time employee and termination of an employee in probation"; and (5) the events of August 5, 2014 wherein plaintiff was terminated.  Id.

### 3.  Dkt. No. 41-5

Dkt. No. 41-5 is an undated and unsigned document titled "Information Requested by Anne Hohenstein" which asks "[w]hen was suit discovered?" and provies, "[a]fter offer made, but before start date.  It was discovered by another Bureau Chief who Googled the candidate in connection with another job."  Dkt. No. 41-5 at 2.

### 4. Dkt. No. 41-6

Dkt. No. 41-6 is an e-mail chain dated July 15, 2014 from Conlon to Brody, Christian, Lodico, and Thomas S. Berkman ("Berkman") titled "Andrea."  Dkt. No. 41-6 at 2.  The e-mail recounts a discussion between Conlon and plaintiff wherein plaintiff indicated that "she is no longer a majority shareholder for the company any more and had no control over what they did."  Id.  The e-mail includes Conlon's commentary that

it was "[a]mazing that this change in circumstance didn't come to light in all of the previous conversations she had with Stu. Of course she then told me the website had been taken down right after our meeting, so apparently control does exist when she wants it to." Id. The e-mail indicates Conlon's belief that "'appearance of impropriety' seems to be lost on [plaintiff]." Id. Finally, the e-mail states that Conlon was "not buying any of this" and that he "do[es]n't know if she can't see it or just wants to try to figure out a new excuse." Id.

### 5. Dkt. No. 41-7

This is a document titled "draft for review" from McTiernan, presumably to Conlon about Conlon's interest in pursuing outside employment as a CPA and the parameters he must follow to be within the guidelines of the Public Officer's Law and the April 26, 2012 General Counsel Memo. Dkt. No. 41-7 at 2-3.

### 6. Dkt. No. 41-8

Dkt. No. 41-8 is an unsigned document titled "CW: confidential conversation with Shari Calnero JCOPE 8 11 14." Dkt. No. 41-8 at 2. The document discusses that the author "raised issue whether sending documents to oneself under these circumstances constitutes disclosure of confidential information[,]" [t]hought it was important to determine if DEC has rule on unauthorized use[,]" "[s]he felt that the question of referral under Section 55 of the Executive Law turns not so much on whether there is a conflict

of interest as whether the person was trying to conceal one or intentionally engaged in one[,]" "[a]nd that in terms of referring the matter, we should not refrain just because there is a fact, which if proved, could show the employee did not know, but rather whether the violation alleged if proved is clear[,]" and "[s]he raised question whether there is a nexus between that violation and her sending the documents to herself."  Id.  The document appears to have a redaction as well as a handwritten note that looks like it says, "confidential conversation with JCOPE & personal notes re: nature of violation." Id.  It appears that Brody is the author of this document.  Dkt. No. 42 at 17.

### 7.  Dkt. No. 41-9

This is an undated, unsigned document titled "Personal Notes re her possible violations."  Dkt. No. 41-9 at 2.  The document, apparently authored by Brody, Dkt. No. 42 at 17,[2] indicates that the author "believe[s] we have reason to believe that she has violated several provisions of the law and this serves as a basis to exercise a right, if we need such a basis to terminate her as a probationary employee."  Id.  The author refers to "the issue of proof," which the author

> believe[s] . . . lies in two principal facts within my knowledge:
> 1. That in November I went through each and every provision of the Code of Ethics as instructed by Ed and Tom to brief her on ethical obligations.  2. That in discussing with her responsibilities in light of her expanded role, I went through certain conditions and a discussion was held with

---

[2] Defendants' memorandum in opposition indicate that this document, among others, are "notes from the file of Brody."  Dkt. No. 42 at 17.

regard to each one and to some she offered objections . . .
but with regard to Number 1, and I emphasize it was number
1, she offered no objection.

Id.  The author expressed a belief that "[n]ot knowing is not credible in view of these

discussions."  Id.  Finally, the author indicated that, "[o]ne could ask, if she was so

unaware of what was going on, then on what basis did she as for more latitude to assist

the business" and "[e]ven assuming she didn't know, that in itself shows poor judgment

as to compel the conclusion that she is incapable of managing her role in the business."

Id.  The author notes that the "only question is whether there is possibly some

explanation in which an event at a recognized and distinguished component of the GE

family of businesses and assumedly at its corporate HQ is not what it seems."  Id.

Finally, the document indicates that the author "see[s] nothing in the law that

compels us to apprise JCOPE of this event[.]"  Dkt. No. 41-9 at 2.  Thus, the author

asks "is there anything tactically gained by doing so," and answers, "I would say not

because she is being terminated and that is showing enough[.]  We can't predict what

they may do and that may provide her a leg up on her inevitable lawsuit against us[.]"

Id.  Finally, the author indicates that s/he "would discharge those obligations under the

Civil Service Law and only those and afford her rights under those laws and only those."

Id.

### 8.  Dkt. No. 41-10

This document is a print out of titles of New York State Ethics Commission

Advisory Opinions with handwritten notes in the margins.  Dkt. No. 41-10.  The

handwritten notes are essentially illegible.  It appears that Brody also authored these notes.  Dkt. No. 42 at 17.

### 9.  Dkt. No. 41-11

This document is an e-mail from Brody to Christian entitled "IG draft" which contains an attachment of a draft of a "'report' to the IG."  Dkt. No. 41-1 at 2.  The draft is addressed to Catherine Leahy Scott at the Office of the Inspector General and is titled "Report of conflict of interest relating to employment under Section 55 of New York State Executive Law, Section 4-1 (Andrea Loguidice)."  Id. at 3.  The draft discusses that plaintiff's work at the DEC "involving General Electric comprised more than 60 percent of her official duties[,]" after plaintiff was hired but before she began working, "the DEC learned that she was the principal of a New York Corporation named the Wandering Dago, a mobile food purveyor and provider of catering services[,]" "[s]hortly after her employment began, Ms. Loguidice met with DEC officials, including the undersigned to discuss the extent to which her outside employment was permissible under the Public Officers Law (the "POL"), "Ms. Loguidice agreed to certain limitations on her outside business activity[,]" plaintiff's June 5, 2014 e-mail to Brody and the General Counsel "stating that she wished to be more involved in the activities of the Company[,]" a July 2, 2014 meeting between plaintiff and Brody "to discuss how the changes she desired could be accommodated within the requirements of the POL[,]" plaintiff's supervisor "brought to [Brody's] attention that the Company's website listed as a 'Wandering Dago location' a catering event at the General Electric's Global Research

site on July 9, 2014[,]" plaintiff's supervisor "immediately removed her from any involvement in General Electric matters" and plaintiff was terminated on August 5, 2014 "for conflict of interest violations[,]" that plaintiff "remained at the DEC offices until 10:30 p.m. on the evening of August 5 during which time she emailed to per personal gmail account dozens of documents and hundreds of emails relating to pending legal matters at the DEC[,]" and that "on August 13, Ms. Loguidice personally dropped off with a DEC secretary, two . . . boxes filled with DEC files, creating the inference that she removed the documents upon her termination and photoduplicated them." Dkt. No. 41-11 at 3-4.

### 10. Dkt. No. 41-12

Dkt. No. 41-12 is an e-mail dated September 16, 2015 from Colleen Galligan to Jack Dew entitled "Loguidice-Discovery" indicating that Galligan "ha[s] confirmed that there was no report to or investigation by the inspector general." Dkt. No. 41-12.

### 11. Dkt. No. 41-13

Dkt. No. 41-13 is a document dated August 20, 2014 signed by the initials SHB indicating that "this document is critical proof that Andrea was aware of the impropriety of dealing with a regulated entity in her outside business." Dkt. No. 41-13 at 2. The document indicated that the memo "refers to our conversation on July 2 in which the enumerated conditions were discussed, notably number 1[,]" and provides that the Wandering Dago event occurred after this discussion but before the event was booked. Dkt. No. 41-13. The author indicates that plaintiff did not receive the memo the author

referenced, but that plaintiff "is aware, however, that I made a recommendation to Ed regarding the expansion of her participation in the Wandering Dago business." Id.

### 12. Dkt. No. 41-14

Dkt. No. 41-14 is a "duty description" for Deputy Commissioner and General Counsel McTiernan.

### 13. Dkt. No. 41-15

Dkt. No. 41-15 is a description of the employment duties of the Executive Deputy Commissioner Gerstman.

### 14. Dkt. No. 41-16

Dkt. No. 41-16 is portions of a transcript of Lodico's October 8, 2015 deposition. Dkt. No. 41-16.

## II. Discussion

### A. Legal Standard

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter." FED. R. CIV. P.

26(b)(1).  Further, "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."  Id.  In New York Teamsters Council Prepaid Legal Servs. Plan v. Primo & Centra, this Court clearly explained the attorney-client privilege:

> The attorney-client privilege is a privilege of common law that is to be applied "in light of reason and experience." United States v. Zolin, 491 U.S. 554, 562, 109 S.Ct. 2619, 2625-26, 105 L.Ed.2d 469 (1989); Fed. R. Evid. 501. The central purpose behind the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). Nonetheless, the privilege is not absolute. "Since the privilege has the effect of withholding relevant information from the factfinder, it applies only where necessary to achieve its purpose." Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976).

159 F.R.D. 386, 388 (N.D.N.Y. 1995).

The attorney-client privilege "enable[s] attorneys to give informed legal advice to clients" and "protects communications between a client and its attorney that are intended to be, and in fact were, kept confidential."  Schaeffler v. United States, 806 F.3d 34, 40 (2d Cir. 2015).  This Court has held that communications are deemed confidential if:

> (1) . . . legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is

waived.[3]

Trudeau v. New York State Consumer Protection Bd., 237 F.R.D. 325, 335-36 (N.D.N.Y. 2006) (citing United Sates v. Int'l Bd. of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997) and (In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1036 (2d Cir. 1984); see also Mejia, 655 F.3d at 132. The privilege protects the attorney's advice to the client and the information communicated by the client that provides a basis for giving advice. See Upjohn Co., 449 U.S. at 390; In re Six Grand Jury Witnesses, 979 F.2d 939, 943-44 (2d Cir. 1992); Chen-Oster v. Goldman, Sachs & Co., 293 F.R.D. 547, 554 (S.D.N.Y. 2013). "But since the privilege stands in derogation of the public's right to every man's evidence, . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle." In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000). The burden of proving the existence of the privilege rests with the party asserting the privilege. See Mejia, 655 F.3d at 132; In re Grand Jury Subpoena Dated July 6, 2005, 256 F. App'x 379, 382 (2d Cir. 2007)). Thus, "[t]he party asserting the privilege must establish the essential elements of the privilege." United States v. Constr. Products Research, Inc., 73 F.3d 464, 473 (2d Cir. 1996) (citations omitted). "Any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege." Koumoulis v. Indep. Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 38 (E.D.N.Y. 2013), aff'd, 29 F. Supp. 3d 142 (E.D.N.Y.

---

[3] The federal attorney-client privilege standard has also been defined in the following manner: (1) [t]he attorney-client privilege protects communications between a client and his or her attorney (2) that are intended to be, and in fact, were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011). The undersigned finds both iterations of the privilege to be a proper statement of the law, and finds no substantial difference between the two in their application.

13

2014) (citing Scholtisek v. Eldre Corp., 441 F. Supp. 2d 459, 462 (W.D.N.Y. 2006) (additional citations omitted)).

"'[T]here is little case law addressing the application of the attorney-client privilege' in the government context." In re County of Erie, 473 F.3d at 417. However, it is clear that the privilege "protects confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance." Id. at 418; Barcomb v. Sabo, No. 07-CV-877 (GLS/DRH), 2009 WL 5214878, at *2 (N.D.N.Y. Dec. 28, 2009) (quoting Trudeau, 237 F.R.D. at 335-36) ("The privilege also protects communications between a government attorney and employees whom he or she serves 'in civil suits between government agencies and private litigants.'")). As

> government has an equal claim for the protection of
> attorney-client privilege communication as any other legal
> entity, the same situation applies to government attorneys
> who are obligated to provide legal advice to 'officials
> responsible for formulating, implementing, and monitoring
> governmental policy' even when they may or may not have
> policy duties.

Id. (citing In re County of Erie, 473 F.3d at 419). "In today's world, an attorney's acumen is sought at every turn, even average attorneys mix legal advice with business, economic, and political advice." Children First Found., Inc. v. Martinez, 04-CV-927 (NPM/RFT), 2007 WL 4344915, at *10 (N.D.N.Y. Dec. 10, 2007) (citing NXIVM v. O'Hara, 251 F.R.D. 109, 126 (N.D.N.Y. 2007)). Thus, "[w]hen an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged." In re

County of Erie, 473 F.3d at 421. "The privilege is 'triggered only' by a request for legal advice, not business advice." NXIVM Corp., 241 F.R.D. at 126. "If the communication between client and lawyer 'is not designed to meet problems which can fairly be characterized as predominately legal, the privilege does not apply." Id. (citing Rattner v. Netburn, 88 Civ 2080 (GLG), 1989 WL 223059, at *6 (S.D.N.Y. June 20, 1989); see County of Erie, 473 F.3d at 419) ("holding that, "[s]o long as the predominant purpose of the communication is legal advice' the privilege prevails."). Although "the privilege covers communications made in connection with the rendering of legal advice, it does not extend to the provision of business and management advice." Fine v. Facet Aerospace Products Co., 133 F.R.D. 439, 444 (S.D.N.Y. 1990).

The attorney-client privilege can be waived, and "is generally waived by voluntary disclosure of the [privileged] communication to another party." Schaeffler v. United States, 806 F.3d 34, 40 (2d Cir. 2015). The privilege can also be waived "when a client asserts reliance on an attorney's advice as an element of a claim or a defense," "testifies concerning portions of the attorney-client communication," or "places the attorney-client relationship directly at issue." In re County of Erie, 546 F.3d at 228. Motions to compel brought pursuant to Fed. R. Civ. P. 37 "are entrusted to the sound discretion of the district court." United States v. Sanders, 211 F.3d 711, 720 (2d Cir. 2000); accord In re Fitch, Inc., 330 F.3d 104, 108 (2d Cir. 2003). This principle "is in keeping with the traditional rule that '[a] trial court enjoys wide discretion in its handling of pre-trial discovery . . . .' " In re Fitch, Inc., 330 F.3d at 108 (internal citations and quotation marks omitted)).

## B.  Analysis

At issue is whether: (1) the discussions at the October 2013, July 14, 2014, and late July 2014 meetings were communications "made for the purpose of obtaining or providing legal advice, as opposed to advice on policy," In re County of Erie, 473 F.3d 413, 419 (2d Cir. 2007); (2) defendants had the authority to waive the attorney-client privilege; (3) defendants waived the attorney-client privilege by asserting the Mounty Healthy defense; (4) defendants waived the attorney-client privilege through production of certain documents.  See generally Dkt. No. 41-1.   Plaintiff seeks an

> (1) Order that Defendants in upcoming depositions answer questions and provide any discoverable documents regarding Plaintiff, the Wandering Dago food truck, and Wandering Dago's litigation against the State, including (but not limited to) the meeting of the bureau chiefs in late October 2013 and the meetings of Defendants and others described supra, and that the Court reopen the deposition of Conlon, at Defendants' cost, to address these subjects[];
>
> (2) Order that Defendants provide any discoverable documents related to any communications they had with any persons regarding the decision to terminate Plaintiff so that Plaintiff may adequately test Defendants' Mount Healthy defense, and that the Court reopen the deposition of Conlon, at Defendants' cost to address this subject[];
>
> (3) Order that Defendants answer questions and provide documents (including, without limitation, unredacted versions of documents already produced) related to the privileged documents that Defendants have already produced in this litigation, and that the Court reopen the deposition of Conlon, at Defendants'; cost, to address this subject.

Dkt. No. 41-1 at 16.

### 1.  Is plaintiff's motion premature?

As a threshold issue, defendants argue that plaintiff improperly seeks, pursuant to Fed. R. Civ. P. 37(a)(3)(B), a "carte blanch order from the Court to, among other things, compel Conlon – and direct other defendants at 'upcoming depositions' – to answer questions on a variety of topics (without identifying the questions she seeks to ask.'"  Dkt. No. 42 at 4.  Defendants contend such a demand is premature, "to the extent it seeks to compel answers from the parties who have yet to be deposed since they have not 'failed' to 'answer a question under Rule 30 or 31.'"  Dkt. No. 42 at 4.  Finally, defendants insist that the motion is also premature because plaintiff does not "seek[] to compel an answer to any specific question or questions from Conlon or Lodico[.]"  Id. at 4.

Fed. R. Civ. P. 37(a)(3)(B)(i) provides that "[a] party seeking discovery may move for an order compelling an answer . . . if: (i) a deponent fails to answer a question asked under Rule 30 or 31."  Defendants argue that the only questions that plaintiff asked and defendants Conlon and Lodico refused to answer on the basis of the privilege are: (1) at Conlon's deposition, "[a]t this bureau chiefs meeting, when somebody asked the question, [i]s that the same party involved in this lawsuit, what was the response?", (2) at Conlon's deposition, "[w]hat was the discussion?" in response to the "discussion between Conlon and Defendant Brody regarding events of July 14, 2014"; and (3) at Lodico's deposition, "[w]hat did you say at the [July 14, 2014] meeting?"  Dkt. No. 42 at 8.

Further, defendants argue that, pursuant to Fed. R. Civ. P. 34, insofar as plaintiff

requests the production of documents, plaintiff has failed to identify "any document defendants failed to produce in discovery, or any redacted document which plaintiff claims should not have been redacted. Nor has plaintiff identified any document identified during the three depositions she has already conducted which defendants failed to produce." Id. at 19-20.

Insofar as plaintiff seeks to compel defendants to "answer questions . . . regarding Plaintiff, the Wandering Dago food truck, and Wandering Dago's litigation against the state . . ." regarding future depositions, the undersigned finds such request to be overly broad and premature. Dkt. No 41-1 at 16; see also Dkt. No. 27 at 8-9. The undersigned also agrees that this motion is premature insofar as plaintiff demands that the Court order defendants to produce "any discoverable documents related to any communications they had with any persons regarding the decision to terminate Plaintiff"; "any discoverable documents regarding Plaintiff, the Wandering Dago food truck, and Wandering Dago's litigation against the State"; and "documents (including, without limitation, unredacted versions of documents already produced) related to the privileged documents that Defendants have already produced in this litigation." Dkt. No. 41-1 at 16. Plaintiff has not identified documents that she claims defendants have been improperly withheld. Indeed, she has not provided the Court with a privilege log or challenged specific entries within such log.[4] As the Court has no knowledge whether

---

[4]   The undersigned does acknowledge that plaintiff indicates that one document that defendants did provide, entitled "Confidential conversation with Shari Calnero JCOPE 8 11 14" was improperly redacted. Dkt. Nos. 41-1 at 2, 41-8 at 2. The undersigned does observe that there appears to be a redaction made in the bottom left hand order. Id. Plaintiff contends that she was "unable to find the basis for the redaction on Defendants' privilege log. Dkt. No. 41-1 at 13. The undersigned does not have access to the privilege log, and, thus, cannot review whether defendants have proffered a reason for the

18

these particular documents exist or to which documents she is referring, the Court can make no assessment of whether they were improperly withheld under Rule 34 and/or are protected by the attorney-client privilege.

The undersigned agrees with the approach taken by another court in this Circuit, which dictates that the "normal practice" requires parties to proceed with a deposition and to "create a record of where questionable inquiries, objections, or assertions of privilege arose and furnish a context for the dispute' thereby enabling the court to resolve the dispute on [a] concrete record.'" Mackenzie-Childs, LLC, 262 F.R.D. at 251 (quoting Pritchard v. County of Erie, 04CV534C, 2006 WL 2927852, at *3 (W.D.N.Y. Oct. 12, 2006). Accordingly, insofar as plaintiff seeks (1) to compel defendants who have not yet been deposed to answer questions that have not yet been asked; and (2) an Order directing defendants provide documents that have not yet been requested, or, if they have been requested, have not been identified for the Court, such motion is denied without prejudice.

### 2. Primary Purpose of Communications

The first argument plaintiff makes is that the defendants' discussions surrounding plaintiff's termination are not protected by the attorney-client privilege because they are business discussions. Dkt. No. 41-1 at 2. There are three communications to which plaintiff contends defendants improperly asserted the privilege: (1) Conlon's refusal to testify regarding the contents of the discussion at the

---

edaction. The undersigned will discuss this document in greater detail below.

October 2013 bureau chiefs' meeting that followed a question whether plaintiff was involved in the Wandering Dago case; (2) Conlon's refusal to discuss the contents of a July 14, 2014 conversation between Conlon and Brody; and (3) Lodico's refusal to answer questions about the details of a conversation held during a meeting in late July 2014 which was "likely" attended by McTiernan, Lodico, Christian, Brody, "and perhaps others." Id. at 3-4.

### a. Conlon Deposition

### i. October 2013 Bureau Chiefs' Meeting

Addressing the first communication, which arose during Conlon's deposition, defendants asserted the privilege in response to the following questions: "what was discussed about hiring the plaintiff?"; "at this bureau chiefs meeting, when somebody asked the question, [i]s that the same party involved in this lawsuit, what was the response?"; "[d]id anyone else . . . say anything in response to the question?" Dkt. No. 41-3 at 7-8, 13, 17.[5]

It appears that this bureau chiefs' meeting was held after plaintiff was hired, but before plaintiff began her employment at the DEC. Conlon testified that McTiernan stated "that we were intending on offering a position to plaintiff," and that he made such a statement "[b]ecause the general counsel would always announce who we were hiring

---

[5] Defendants also objected to the question, "[a]fter this question was asked, who spoke in response to it?", but Conlon testified that he could not recall who spoke in response to the question. Dkt. No. 41-3 at 8. Later in the deposition, plaintiff's counsel asked this question again, "who spoke in response to it ?" (referring to the question about plaintiff's involvement in the Wandering Dago suit), and Conlon again indicated that he was "not sure exactly who may or may not have spoken out of the group of the bureau chiefs meeting after the issue was raised." Dkt. No. 41-3 at 17-18. Thus, the undersigned is of the understanding that this question is not subject to the parties' dispute as the Court cannot compel a party to answer a question to which he has already testified he cannot recall.

or not hiring at a meeting." Dkt. No. 41-3 at 7. Defendants have not met their burden of demonstrating that a response to the question whether plaintiff was the same party involved in the Wandering Dago law suit is an attorney-client privileged communication. Conlon testified that he did not recall a discussion of the Wandering Dago lawsuit occurring at the meeting. Id. at 12. It does not appear that this question, asking about the involvement of the recent hire or intended hire in an unrelated case to which defendants were not a party, was asked in order to obtain legal advice or that a response or discussion following this question would involve the giving or receiving of legal advice. In re County of Erie, 473 F.3d at 419. Further, as Conlon indicates he does not recall a discussion of the Wandering Dago lawsuit and defendants provide no indication that the conversation involved a discussion of such, Dkt. No. 41-3 at 9-10, it would not appear that any discussion about plaintiff that followed this question would be primarily related to the purpose of giving or obtaining legal advice. Rather, any discussion following this question would be predominately a personnel or human resources issue which would not be "legal advice" that would rely on the specific expertise of attorneys in their role as counsel.

Accordingly, as defendants have presented no evidence that the discussion of plaintiff at the October 2013 bureau chiefs' meeting was "made for the purpose of obtaining or providing legal advice," the undersigned concludes that defendants have not met their burden of demonstrating that this conversation is subject to the attorney-client privilege. Therefore, plaintiff's motion is granted insofar as Conlon must answer what was said in response to the question whether plaintiff was involved in the

Wandering Dago lawsuit, "what was discussed about hiring the plaintiff?", and "did anyone else say anything in response to the question?" Dkt. No. 41-3 at 13. The undersigned denies plaintiff's motion relating to this deposition insofar as she requests that Conlon be deposed at defendants' expense.

### ii. July 14, 2014 Conversation

Next, plaintiff seeks to compel Conlon to answer questions regarding a discussion he had with Brody on July 14, 2014. Conlon testified that Brody sent him a copy of the Wandering Dago's event list from its website because he "believe[d] the information on the website had been taken down at that point in time and he still had a copy of the information because it was previously sent to him." Dkt. No. 41-3 at 21. Conlon further testified that he asked Brody, in person, to e-mail him a list of the Wandering Dago food truck's latest events. Dkt. No. 41-4 at 21. Defendants' attorney objected to the question "[w]hat was that discussion?[,]" referring to the conversation between Brody and Conlon. Id. at 21-22. Conlon testified that the discussion was, "in part" about "the propriety or impropriety of the plaintiff's conduct." Id. at 23. Conlon's attorney objected to the question, "[d]id he [Brody] suggest that the conduct was improper?" Id. Conlon testified "in part" in response to a question whether he went "to Mr. Brody to seek advice on a question of law." Id. at 24. In response to an inquiry "what else did Mr. Brody say about this event, if anything?" about the Wandering Dago's event on the GE campus, defendants' attorney objected and asserted the attorney-client privilege. Id. at 24-25.

22

Plaintiff contends that the conversation between Conlon and Brody was "a discussion between two DEC employees about whether a third employee should be disciplined. This is a business discussion, not the delivery of legal advice." Dkt. No. 44 at 6 (citing <u>Neuder v. Battelle Pacific Northwest Nat. Lab.</u>, 194 F.R.D. 289, 293-94 (D.D.C. 2000). In <u>Neuder</u>, the District Court for the District of Columbia relied on a District of Kansas case, <u>Marten v. Yellow Freight Sys., Inc.</u>, to conclude that where a personnel review committee "inquires about the legal implications of a proposed decision to terminate an employee, the business purpose of the decision predominates over the legal issues discussed." <u>Id.</u> at 293 (citing <u>Marten v. Yellow Freight Sys., Inc.</u>, No. Civ. A. 96-2013-GTV, 1998 WL 13255 (D. KS Jan. 6, 1998)). The <u>Neuder</u> court concluded that the "primary function of the review committee was to terminate [the plaintiff,]" and that, "although legal review was one purpose for the meeting, it was merely incidental to the primary business function." <u>Id.</u> In <u>Neuder</u>, the conversation in question took place among a committee that was formed pursuant to the defendants' disciplinary policy, which "provides that the PARC [review committe] is called to review and concur in termination decisions and to approve proposed terminations." <u>Id.</u> at 294. Thus, the court concluded that, although in-house counsel served as a member of this committee, the legal implications of the committee's determination to terminate an employee was just one aspect of their function in making a termination decision, and their overall function was predominately non-legal. <u>Id.</u> at 293-94.

Here, Conlon and Brody were not acting as part of an officially-designated committee whose sole purpose – as defined by corporate policy – was to review or

approve terminations.  Cf. Neuder, 194 F.R.D. at 294.  In fact, the record supports they did not meet solely to determine the legal and other implications of *terminating* plaintiff; rather, Conlon indicated that they were discussing the impropriety of her conduct.  Such a discussion suggests a legal analysis of whether plaintiff's conduct violated conflict of interest rules or laws.  This distinction is not without significance.

Plaintiff also cites Fine v. ESPN, Inc.,12-CV-836 (LEK/DEP), 2015 WL 3447690, at *8 (N.D.N.Y. May 28, 2015) for the proposition that, where a business purpose predominates over the legal issues discussed, the discussion is not privileged.  Dkt. No. 44 at 7.  In Fine,[6] the parties sought review of whether (1) certain documents they claimed to be protected by the work-product privilege were prepared in anticipation of litigation versus for business purposes, and (2) whether certain withheld documents were protected by the attorney-client privilege.  Judge Kahn first reviewed Judge Peeble's decision to grant the plaintiff's motion to compel documents withheld under a work-product privilege because he found that, even if it were the case that the defendant anticipated litigation when it created the withheld documents, "the party asserting the privilege still bears the burden of showing that the document would not have been produced in a similar form absent anticipated litigation[,]" which the defendants did not show.  Id. at *6-7.  As to documents created by an outside public relations firm, which defendants claimed were attorney-client privileged, defendants

_____

[6]  The Court also notes, though does not find dispositive here, that Fine applied the New York law of privilege.  See Fine, 2015 WL 3447690, at *9 (N.D.N.Y. May 28, 2015);  Tompkins v. R.J. Reynolds Tobacco Co., 92 F. Supp. 2d 70, 75 (N.D.N.Y. 2000) ("New York law governing the attorney-client privilege . . . is generally similar to accepted federal doctrine.").

argued that the documents should be protected under the agency exception, which required that "the communications disclosed to a third party must be *necessary* to facilitate attorney-client communications and for the provision of legal advice" – a standard that defendants do not argue applies here. Id. at *10-11.

Thus, insofar as the Fine Court applied a test for the work-product doctrine, such is of little applicability here, as the relevant assessment applied when a work-product privilege is raised is whether the "'documents generated during the course of that investigation would have been prepared in the ordinary course of business irrespective of whether there was potential for litigation." 2015 WL 3447690, at *7. Insofar as the Fine Court reviewed the defendants' claim that certain documents were protected by the attorney-client privilege under the agency exception, this exception also was not raised in the case at bar. Thus, Fine's conclusion that materials prepared during an investigation into employee misconduct were primarily created for a business purpose versus in preparation for litigation does not assist the undersigned.

Although the undersigned finds little guidance in Neuder or Fine, the undersigned does acknowledge that "[i]n the context of corporate counsel, the question of whether the attorney-client privilege applies 'usually is whether the communication was generated for the purpose of obtaining or providing legal advice as opposed to business advice.'" Scott v. Chipotle Mexican Grill, Inc., 94 F. Supp. 3d 585, 596 (S.D.N.Y. 2015), motion for relief from judgment denied, 103 F. Supp. 3d 542 (S.D.N.Y. 2015) . Thus, the focus is the capacity in which the attorney is consulted. Id. at 956. Further, the assessment of whether a communication is attorney-client privileged

(versus whether a document is protected by the work-product privilege)

> does not require a showing that obtaining or providing legal advice was the sole purpose of [the] investigation' nor that the communications at issue 'would not have been made' 'but for' the fact that legal advice was sought . . . . The party invoking the attorney-client privilege, therefore, need only show that the provision of legal advice was the 'primary purpose' of the investigation and of the communications as to which the privilege is claimed.

United States v. Mount Sinai Hosp., __ F. Supp. 3d___, 13-CV-04735 (RMB/BCM), 2016 WL 2587393, at *2 (S.D.N.Y. May 4, 2016) (internal citations omitted).  "Where that is the predominant purpose, other 'considerations and caveats' are not severable and the entire communication is privileged."  Fox News Network, LLC v. U.S. Dep't of Treasury, 911 F. Supp. 2d 261, 271 (S.D.N.Y. 2012) (quoting In re Cnty. of Erie, 472 F.3d at 420).  "In the context of the attorney-client privilege, 'legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct.'"  Koumoulis, 295 F.R.D. at 37 (quoting In re Cnty. of Erie, 473 F.4d 413, 419 (2d Cir. 2007)).

Here, it appears that the "primary purpose" of this meeting was to obtain or provide legal advice regarding whether plaintiff's conduct amounted to a conflict of interest.  Dkt. No. 41-3 at 23.  Conlon testified the portion of the conversation that did not seek legal advice was Conlon's request that Brody e-mail him the list of the Wandering Dago event locations.  Id. at 24.  Discussing whether an attorney's actions have created a conflict of interest or violated certain laws or rules appears to be comparable to an internal investigation.

In the context of an internal investigation, however, that test

26

'does not require a showing that obtaining or providing legal
advice was the sole purpose of [the] investigation' nor that
the communications at issue 'would not have been made'
'but for' the fact that legal advice was sought . . . . The party
invoking the attorney-client privilege, therefore, need only
show that the provision of legal advice was the 'primary
purpose' of the investigation and of the communications as
to which the privilege is claimed.

United States v. Mount Sinai Hosp., __F. Supp. 3d___, 13-CV-04735 (RMB/BCM),

2016 WL 2587393, at *2 (S.D.N.Y. May 4, 2016) (internal citations omitted).  Unlike at

the October 2013 meeting, at the July 14, 2014 meeting, plaintiff had begun working for

the DEC, and defendants were aware of a potential conflict of interest created by the

Wandering Dago event at G.E.  Although the portion of the conversation requesting a

copy of the schedule is clearly not privileged, nor do defendants claim as such,

conversation regarding whether plaintiff committed a violation of a rule, regulation or

law, is legal advice.  Accordingly, plaintiff's motion to compel, insofar as she seeks to

compel Conlon to testify regarding the contents of his conversation with Brody on July

14, 2014, is denied.


### b.  Philip Lodico's Deposition

Addressing Philip Lodico's deposition, the questions that defendants objected to

were: (1) "what did you say at this meeting," referring to a meeting in late July 2014 that

was likely attended by McTiernan, Brody, Christian, and Conlon; and (2) "[d]id you

make any effort at this meeting to understand the totality of the circumstances

surrounding the event at GE?"  Dkt. No. 41-16 at 6-9.  Lodico testified that the

substance of this meeting was "the import of the catering event at the GE site[,] Andrea's ability to carry out her responsibilities as the natural resource damages attorney

In Koumoulis, where defendants sought to claim the attorney-client privilege for outside counsel's communications regarding terminating an employee, the Eastern District of New York observed that the counsel's communications were to human resource employees and commented on non-legal advice, such as "exactly what questions to ask during interviews and what statements to make during meetings, including routine human resource topics like improving Mr. Koumoulis's job performance, customer interactions, and communication skills." Koumoulis, 295 F.R.D. at 45. Thus, the Eastern District concluded that the outside counsel's conversations were not subject to the attorney-client privilege. Id.

Although merely citing to a law or regulation does not render the communication privileged, discussing the "import of the catering event at the GE site," suggests an assessment of whether plaintiff's conduct created a conflict of interest. Dkt. No. 42 at 7. It would appear that a discussion of "[o]ptions available under the civil service law" involves the "interpretation and application of legal principles to guide future conduct or to assess past conduct." In re Cnty. of Erie, 472 F.3d at 419. Similarly, insofar as Lodico testified that the defendants spoke about "options available under the civil Service Laws," such would also appear to involve an assessment of whether plaintiff's conduct violated such laws – a discussion that involves legal, rather than business advice. Id.

However, the undersigned finds differently insofar as the conversation involved "Andrea's ability to carry out her responsibilities as the natural resource damages attorney."  Dkt. No. 42 at 7.  An assessment of plaintiff's ability to continue her work in light of defendants' awareness of a potential conflict of interest would not appear to be a legal issue, but rather an assessment involving logistics, such as whether plaintiff would be able to continue her work in a capacity that screened her from GE matters.  The record supports that plaintiff's work was "more than 60%" GE related.  Dkt. No 41-11 at 3.  Further, documents that were produced during discovery revealed that after the conflict was discovered, plaintiff's supervisor removed her from all GE work.  Id.  Although the determination of whether a conflict of interest occurred may implicate a legal assessment, whether to continue an employee in the same line of work once a potential conflict has been discovered and assessed and determined to be a violation of a law, regulation, or policy, is primarily a business determination.

Accordingly, plaintiff's motion to compel, insofar as she seeks to have Lodico answer questions relating to the late July 2014 meeting regarding "the import of the catering event at the GE site" and "[o]ptions available under the civil service law" is denied, as defendants have met their burden of demonstrating that these communications are protected by the attorney-client privilege.  Dkt. No. 42 at 7.  However, to the extent plaintiff seeks to ask Lodico questions regarding what was said relating to plaintiff's "ability to carry out her responsibilities as the natural resource damages attorney[,]" such motion is granted.  Id.  Should plaintiff seek to depose Lodico in order to obtain answers relating to this limited topic, she may do so, but the

undersigned declines to require defendants to pay costs.

## 2. Waiver of Privilege

Plaintiff argues that defendants waived the attorney-client privilege insofar as they released certain documents during the discovery process and by invoking the Mount-Healthy defense. Plaintiff contends that defendants, as officers or directors, had authority to waive, and did waive nonparty DEC's privilege. Plaintiff argues that McTiernan, the DEC Deputy Commissioner and General Counsel, and Gerstman, the Executive Deputy Commissioner, were both "'among a group of core management in a corporate structure [who] . . . possess the authority to waive the corporation's attorney-client privilege.'" Dkt. No. 41-1 at 9-10 (quoting Barcomb, 2009 WL 5214878, Dkt. No. 44 at 8. Defendants argue that only the DEC can waive the privilege, and the DEC has not waived. Dkt. No. 42 at 8-10. Plaintiff argues that "[i]t is well-established that in government agencies – just as in corporations – certain employees within an agency, by virtue of either express authority or the nature of their position, can waive the agency's privilege." Dkt. No. 44 at 8 (citing Oasis Int'l Waters v. U.S., 110 Fed. Cl. 87, 111 (Fed. Cl. 2013) and Barcomb, 2009 WL 5214878, at *4).

### i. Did defendants have the authority to waive the privilege?

Defendants cite United States v. Wells Fargo Bank, N.A., 132 F. Supp. 3d 558 (S.D.N.Y. 2015), to argue that, because only the client may waive the privilege – here, the DEC – nothing that defendants have done could waive the privilege because that

privilege belongs solely to the DEC.  Dkt. No. 42 at 9-10.  Defendants are correct

insofar as they argue that as the privilege belongs to DEC; however, <u>Wells Fargo</u> does

not support the contention defendants are suggesting – that certain DEC employees or

agents could *never* waive the privilege on behalf of DEC.

In <u>Wells Fargo</u>, a former employee sought to compel the corporation to waive its

attorney-client privilege so that he may use the attorney-client privileged material in

support of his advice of counsel defense.  132 F. Supp. 3d at 560.  The employee

argued that his right to present a defense "overrides" the bank's right to invoke the

attorney-client privilege.  <u>Id.</u> at 561.  The Southern District of New York – relying on a

Sixth Circuit case, <u>Ross v. City of Memphis</u>, 423 F.3d 596 (6th Cir. 2005) wherein a

former police director who sued the city and certain members of the police department

for discrimination, one defendant sought to compel the city to waive the privilege so that

he could rely on the advice of counsel for the basis of a qualified immunity defense –

determined that notions of fairness did not outweigh the holder of the privilege's right to

keep the material confidential.  <u>Id.</u> at 563-64.  There was no argument in the <u>Ross</u> or

<u>Wells Fargo</u> cases that the material should be disclosed because a defendant who had

the authority to waive the privilege waived such privilege – in fact, the Court pointed out

that the employee "indisputably[] lack[ed] authority."  <u>Id.</u> at 563.  Thus, although <u>Ross</u>

and <u>Wells Fargo</u> may be relevant for the general proposition that the attorney-client

privilege outweighs the significance and import of the rights of litigants who wish to rely

on such material to support a defense, they are not relevant to plaintiff's argument that

defendants, by nature of their positions within the DEC, had authority to waive, and did

waive the DEC's privilege.

Defendants do not address any of the case law that supports the argument that officers or directors have the authority to waive a corporation's privilege and that certain defendants are in such positions of authority to waive the privilege. Thus, an assessment of this case law is required to determine whether any defendants had the authority to waive the privilege on the DEC's behalf. The Supreme Court has explained:

> As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken by individuals empowered to act on behalf of the corporation . . . .The parties in this case agree that, for solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors.

Bus. Integration Servs., Inc. v. AT & T Corp., 251 F.R.D. 121, 124 (S.D.N.Y. 2008), aff'd, No. 06 CIV 1863 (JGK), 2008 WL 5159781 (S.D.N.Y. Dec. 9, 2008) (quoting Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985); Barcomb, 2009 WL 5214878, at *3 (citing Mackenzie-Childs LLC, 262 F.R.D. 241 ("[I]n a corporate setting, the only individuals able to assert or waive the corporation's attorney-client privilege are those who are officers and directors.") "Since entities can only act through agents, any privilege that attaches to communications on corporate matters between . . . employees and . . . counsel belongs to the corporation, not to the individual employee.'" Barcomb, 2015 WL 5214878, at *3 (N.D.N.Y. Dec. 28, 2009) (quoting E.B. v. New York City Bd. of Educ., No. 02-CV-5118 (CPS/MDG), 2007 WL

2874862, at *4 (E.D.N.Y. Sept. 27, 2007)); <u>Winans v. Starbucks Corp.</u>, No 08 Civ. 3734 (LTS/JCF), 2010 WL 5249100, at *3 (S.D.N.Y. Dec. 15, 2010) (citing <u>In re O.P.M. Leasing Services, Inc.</u>, 670 F.2d 383, 386 (2d Cir. 1982) ("Where a corporate entity seeks legal advice, the attorney-client privilege belongs to the corporation alone.  It follows that the privilege may be waived only by corporate officers or directors with the authority to do so.") (additional citation omitted)).

Parties have not provided, nor has the Court found, a case that is exactly on point here – where a plaintiff argues that officers/directors had the authority to waive the privilege and did waive the privilege, but the corporation explicitly denies that it granted permission to waive.  In <u>In re Grand Jury Proceedings</u>, the Second Circuit noted, although in the context of an officer presumably waiving the corporation's privilege in his individual testimony before a grand jury, that although "a corporation may impliedly waive its privilege through the testimony of one of its officers, they hardly stand for the proposition that this must always be the case."  219 F.3d 175, 186 (2d Cir. 2000). Although <u>In Re Grand Jury Proceedings</u> is distinguishable on its facts, the undersigned finds this general principle persuasive.  The Court does not believe that an officer or director with authority to waive the privilege automatically will result in a waiver of that privilege; instead, a case-by-case assessment of the particular circumstance is necessary.  <u>Id.</u>

As plaintiff points out, McTiernan was the Deputy Commissioner and General Counsel for the DEC.  His duties included "serv[ing] as chief legal officer" to the DEC and "[p]rovide legal advice to the Commissioner, Executive Deputy Commissioner,

33

Deputy and Assistant Commissioners." Dkt. No. 41-14 at 2. It is unclear whether general counsel is to be considered an officer/director with authority to waive the privilege. Parties have provided insufficient evidence to support whether general counsel of a corporation has sufficient authority or implied authority to waive the attorney-client privilege on behalf of the corporation. Although case law supports that officers or directors, essentially corporate management, have the authority to waive the attorney-client privilege, Bus. Integration Servs., Inc., 251 F.R.D. at 124, research did not reveal case law supporting that general counsel or in-house counsel has the implied right to waive a corporation's attorney-client privilege solely due to the nature of his or her position.

Accordingly, the undersigned declines to conclude at this time that McTiernan had the authority to waive the DEC's attorney-client privilege. However, the undersigned is convinced that Gerstman, as Executive Deputy Commissioner – "second in command to the Commissioner regarding the overall management of the Department of Environmental Conservation" – likely would fall into the "inner core" of managers/officers/directors with authority to waive the DEC's privilege. Dkt. No. 41-15 at 2. As Gerstman's position requires explicit involvement in the management of the DEC, would be one of the authorities with the ability to waive this privilege. Bus. Integration Servs., Inc, 251 F.R.D. at 124.

Finally, plaintiff argues that the remainder of the defendants waived the privilege because, although they otherwise may lack authority, because the holder of the privilege, the DEC, "authorized the employee's possession of the confidential

communication" and "[a]dequate steps were not taken to ensure the information's confidentiality," the remainder of the defendants were able to waive, and did waive, the DEC's privilege.  Dkt. No. 41-1 at 10 (citing Barcomb, 2009 WL 5214878, at *4). However, Barcomb does not appear to support the proposition for which plaintiff cites it. In Barcomb, the Court determined that lower-level employees waived the attorney-client privilege when they sent e-mails containing privileged materials to third parties.  Id. at *2-4.  The Court noted that some of the employees who received the confidential email did not need to know the substance of the emails in order to adequately perform their jobs.  Id. at *4.  Therefore, "[t]he electronic mails were clearly not all for the purpose of obtaining or communicating legal advice."  Id. at *4.  The scope of the waiver extended to "all communications related to the subject matter of Barcomb's employment status." Id. at *6.

Here, however, plaintiff does not explain how the DEC provided the remaining defendants with access to privileged communications and failed to take steps to insure their confidentiality.  Unlike in Barcomb, plaintiff is not arguing that the employees who received confidential communications disclosed them to parties who did not "need[] to know the substance of the confidential information to perform their jobs adequately." Id.; see also Norton v. Town of Islip, 04-CV-3079 (PKC/SIL), 2015 WL 5542543, at *3 (E.D.N.Y. Sept. 18, 2015).  Indeed, the question here is not whether the privilege was waived because lower-level employees shared the documents with other employees within the DEC; rather, it is whether the privilege was waived by defendants releasing the documents to plaintiff during discovery. The undersigned remains unconvinced that

the remainder of the defendants waived the privilege under the theory presented in Barcomb.

Accordingly, the undersigned finds that, although Gerstman has an implied authority to waive the DEC's attorney-client privilege by nature of his position, even if this privilege were waived as to the DEC on Gerstman's behalf,[7] the privilege is not waived as the other, non-DEC parties to these communications have declined to waive their attorney-client privilege with respect to the communications. Further, the undersigned declines to find that the remaining defendants have the implied authority to waive the attorney-client privilege on the DEC's behalf.

### ii.  Was the privilege waived?

Plaintiff argues that defendants waived the DEC's attorney-client privilege insofar as they produced several documents during discovery that revealed privileged material. The undersigned will review each document in turn to assess whether release of the document has waived the attorney-client privilege, and, if so, to what extent. Case law provides that, "[w]ith some exceptions, the attorney-client privilege is automatically waived when a privileged communication is disclosed to a third party or litigation adversary." Scott, 94 F. Supp. 3d at 598 (citing Ricoh Co., Ltd. v. Aeroflex Inc., 219 F.R.D. 66, 70 (S.D.N.Y. 2003)).

### a.  McTiernan Memo

---

[7]  The undersigned will assess in the following section whether this privilege was waived.

The August 5, 2014 memo largely sets forth the factual background surrounding the alleged conflict of interest that arose with regard to the Wandering Dago event on the GE campus. Dkt. No. 41-14 at 2. The first three paragraphs of this memo, as well as the last paragraph (starting, "August 5, 2014) are entirely factual. Although some factual allegations can amount to attorney-client privileged material, these factual recitations do not appear to reveal any confidential communications or information necessary for the rendering of legal advice. The fourth paragraph of the memo, starting with the heading "Coordination" is a closer question. This paragraph indicates McTiernan's discussions with Maureen Coleman, Governor's counsel; Anne Hohenstein, DEC's contact at GOER; Lori Belgrade and Marc Cadrette, from personnel; and a discussion with Gerstman and Mike Valforte, the General Counsel at GOER. Id. In the memo, McTiernan indicates that "[t]he advice I received was that this error in judgment was serious enough to warranted [sic] discipline in the case of a full time employee and termination of an employee in probation." Id. In making this statement, McTiernan collectively refers to the advice that he received about plaintiff's conduct. However, it is unclear whether McTiernan is contending that the recommendations he received to terminate plaintiff were based on the various advisors' opinions that plaintiff violated certain laws or whether this advice also was based on a personnel/human resources reason not directly related to any potential legal violations. Insofar as McTiernan had a discussion with members of DEC personnel, it would not appear that those communications would be privileged, as such conversations would likely involve human resources issues, not ones that require legal expertise from counsel in his role

as an attorney.  See generally Koumoulis, 29 F. Supp. 3d at 146 (("Despite its legal

content, human resources work, like other business activities with a regulatory flavor, is

part of the day-to-day operation of a business; it is not a protected legal activity.").  It is

at least arguable, however, that discussions with GOER would involve opinions on

whether plaintiff violated certain ethics rules or laws.  If it is the case that McTiernan,

Hohenstein, Coleman, and Valforte discussed whether plaintiff's conduct amounted to

violations of laws or regulations,[8] such a request or receipt of legal advice would appear

to be an attorney-client privileged matter.  Thus, it must be determined whether release

of this memo, which contained mention of this discussion, waived the privilege in

connection with those conversations and, if so, the extent or scope of that waiver.

First, as the nonparty entities point out, even if McTiernan had authority to waive

the DEC's attorney-privilege, a determination that the undersigned does not make, he

does not have authority to waive the privilege with respect to the Governor's Counsel's

Office.  Dkt. No. 43.  Thus, even if he revealed any privilege with respect to referring to

the general advice received in his conversations with Coleman, Hohenstein, or Valforte,

McTiernan is not in a position of authority within the *Governor's Office* to provide such

waiver.  Thus, the only waiver that the production of this memo could elicit is that in

connection with legal advice received from within the DEC.  See generally Hunter

Douglas, Inc. v. Comfortex Corp., No CIV. A. M8-85 (WHP), 1999 WL 14007, at *2 n.5

(S.D.N.Y. Jan. 11, 1999).  The only DEC contacts he discusses in this memo are Lori

_____

[8]  The undersigned does not know the content of these conversations, as McTiernan has not yet
been deposed.

38

Belgrade and Marc Cadrette from Personnel.   As the undersigned concludes that any discussions McTiernan had with personnel would primarily result in non-legal questions, such conversations are not privileged.

Accordingly, as the DEC does not have the authority to waive the attorney-client privilege relating to conversations that McTiernan had with attorneys from the Governor's office, any waiver of the DEC's attorney-client privilege does not require the Court to compel defendants to testify to conversations that McTiernan had with attorneys from outside of the DEC.  Thus, plaintiff's motion is denied with respect to the legal advice McTiernan sought from Hohenstein, Coleman, and Valforte.  Insofar as plaintiff seeks testimony regarding McTiernan's conversations with Cadrette and Belgrade or any documents that may exist relating to personnel, the undersigned anticipates discussions with personnel would not implicate the attorney-client privilege. However, the court has no questions or document demands before it with respect to the discussions McTiernan had with Cadrette and Belgrade; thus, the motion is premature[9] as the undersigned cannot compel defendants to answer questions or produce documents that have not been requested.

### b.  "Information Requested by Anne Hohenstein" Memo

This document reveals no attorney-client privileged information on its face.  Dkt.

---

[9]  Although the undersigned concludes that plaintiff's demands are premature, the undersigned concludes that because McTiernan's conversations with personnel would be primarily related to nonlegal issues, the undersigned anticipates that defendants would be unlikely to raise the attorney-client privilege with respect to these conversations.

No. 41-5.  It is solely a factual recitation of an apparent request for information.

Investigation summaries and updates are not legal advice, and, thus, are not protected

by the attorney-client privilege.  Koumoulis, 295 F.R.D. at 45 (citing Walker v. N.H.

Administrative Officers of the Courts, 11-CV-421-OB, 2013 WL 672584, at *7-*8 (D.

N.H. Feb. 22, 2013).  The difficulty here is that is likely that plaintiff intends to use this

document to ask the author questions about any conversation that preceded or resulted

from the creation of this document.  However, this document is undated, and there has

been no testimony introduced about this document.  If this document were drafted *prior*

*to* the discovery of the alleged conflict of interest violation, then, much like the

conversation at the October 2013 bureau chiefs' meeting before the alleged conflict of

interest was discovered, it would not likely be attorney-client privileged as it would be

more akin to discussing business or personnel issues surrounding the hiring of a new

employee.  No factual questions have been asked yet regarding this document; thus,

the undersigned has no way of assessing whether any questions might be attorney-

client privileged.

Accordingly, insofar as plaintiff contends that the production of this document

amounts as a waiver of the attorney-client privilege, the undersigned declines at this

time to reach that determination as: (1) on its face, it does not appear to reveal any

privileged information and defendants do not claim the document to be privileged[10]; and

(2) there is insufficient information about the context in which this document was

drafted, and, as such, the Court cannot assess.  This determination is made without

---

[10]  Defendants also do not contend that the document is protected by work-product privilege.

prejudice to plaintiff seeking to raise this issue at a later date should it be determined necessary.

### c.  July 15, 2014 e-mail

This e-mail from Conlon to Brody, Christian, Lodico, and Berkman is a factual recitation of a conversation between plaintiff and Conlon.  None of the content appears to involve the giving or receiving of legal advice.  Instead, it is Conlon's assessment or opinion of the truthfulness or credibility of plaintiff's explanation.  The undersigned does not have any questions before it regarding this e-mail, and, thus, cannot assess whether any questions may result from this e-mail that may involve the attorney-client privilege.  Accordingly, the undersigned concludes that the disclosure of the July 15, 2014 e-mail does not amount to a waiver of the attorney-client privilege.

### d.  July 9, 2014 draft memo

It is unclear whether plaintiff is contending that defendants waived their attorney-client privilege regarding a draft memo, apparently composed by Brody for McTiernan's signature, to send to Conlon regarding the approval and parameters of outside work. Plaintiff states that this document "is relevant because Conlon is an example of a DEC employee whom Plaintiff believes engaged in at least an apparent conflict of interest – and likely an actual conflict – but was not investigated or sanctioned in any way." Dkt. No. 41-1 at 13.  However, plaintiff does not provide how she thinks that providing this document waived the attorney-client privilege and in what respect.  Based on the

portions of the transcript the parties have provided, there has been no testimony nor questions asked relating to this document. However, to the extent plaintiff may be suggesting that defendants' providing this document somehow waives the privilege with respect to attorney-client communications with whether *her* outside employment violates the attorney-client privilege, the undersigned disagrees.

### e. August 11, 2014 Notes

Plaintiff provides that this document is Brody's notes regarding a conversation he had with Shari Calnero, the associate counsel to the Joint Commission on Public Ethics ("JCOPE").[11] Dkt. No. 41-8 at 2. The Court agrees that this document does contain the obtaining and providing of legal advice as it includes Calnero's opinions regarding whether plaintiff has violated ethics laws. Id. The undersigned finds that defendants, by providing this document to plaintiff, have waived the attorney-client privilege insofar as it relates to conversations regarding whether plaintiff's alleged acts of sending documents to her self violated any ethics regulations or laws. Defendants have not addressed this document in detail, and merely contend that this is one of several documents from Brody's 'file' that is "factual in nature and mostly reflect Mr. Brody's

---

[11] "The Commission provides advice and guidance to state officers and employees and lobbyists and clients concerning ethics and lobbying laws. In addition, the Commission may issue formal and binding advisory opinions or guidance in the form of nonbinding informal advisory opinions to individuals and entities within its jurisdiction."  http://www.jcope.ny.gov/about/jurisdiction.html (last visited Aug. 22, 2016).

conversations with plaintiff." Dkt. No. 42 at 17.[12]

To the extent plaintiff suggests this document has been improperly redacted or that there is no basis for the redaction in the privilege log, that matter is not properly before the Court. As the Court was not provided with the privilege log, the Court is unable to assess whether the redaction was proper. In re Symbol Techs., Inc. Sec. Litig., No. CV 05-3923 (DRH/AKT), 2015 WL 5719719, at *7 (E.D.N.Y. Sept. 29, 2015) ("While '[c]ourts have a degree of discretion in assessing whether a claim of privilege has been adequately supported,' a party's privilege log, supporting affidavits and an in camera review of the documents themselves are generally required to permit a proper inquiry).[13]

Accordingly, in releasing this document, the undersigned concludes that defendants have waived the attorney-client privilege regarding any conversation Brody had with JCOPE's Shari Calnero regarding whether plaintiff's conduct violated ethics laws. To the extent the reacted portion of this document reflects advice received from Calnero, such privilege is waived with respect to that advice. However, the undersigned declines to find that this waiver amounts to a broad waiver as to *any* advice defendants received regarding plaintiff.

---

[12] The parties do not address whether it is necessary to ascertain if JCOPE has waived the attorney-client privilege. It is unclear, even if DEC waived its privilege with respect to communications between the DEC and JCOPE whether JCOPE would need to waive any privilege. However, the undersigned notes that JCOPE is not among one of the nonparties who expressed opposition to plaintiff's motion to compel. Thus, although the undersigned recognizes that waiver by one party to a communication does not necessarily mean that the other party waives the privilege; JCOPE has not asserted a privilege.

[13] Plaintiff has not sought, and, thus, the parties have not briefed, whether an in camera review of redacted or withheld documents would be necessary to assess whether certain materials are privileged. Accordingly, the undersigned will not assess such matters.

### f. "Personal Notes re her Possible Violations"

This undated document appears to reflect Brody's opinions on whether plaintiff committed ethical violations.  Dkt. No. 41-9.  The purpose behind the creation of this document is unclear, such as whether it was written to someone within the DEC or intended only for Brody's eyes.  If this document were composed solely to reflect Brody's thoughts on plaintiff's conduct, it would not appear that it would amount to the giving or receiving of legal advice.  If anything, this kind of document would be closer to protected work-product.  However, defendants do not contend, nor does it appear that such an argument would be successful, that Brody composed this document in anticipation of litigation.  See generally Fine, 2015 WL 3447690, at *7 (discussing work product standard).

The Court concludes that this document does not reveal attorney-client privileged matters.  It is noted that defendants have not claimed any privilege with respect to this memorandum.  As such, the undersigned anticipates that defendants will testify freely regarding this document.  Insofar as plaintiff anticipates otherwise, the Court does not have any specific questions before it to review, and, thus, it is unable to assess whether questions that may be asked of Brody would fall within a waiver of the privilege.  Accordingly, the undersigned declines to direct defendants to answer questions at future depositions that have not yet been asked.

### g. List of Ethics Commission Opinions

The undersigned does not find this list of Ethics Commission case names,

44

without more, to be attorney-client privileged material.  Dkt. No. 41-10.  The undersigned is unable to read the illegible, hand-written notes on this page, and plaintiff only "translates" one comment – "no cases on point."  Although it is entirely possible that these handwritten notes may contain privileged information, because they are illegible, it is equally possible that these notes contain no privileged information.  Thus, the undersigned cannot make an assessment of whether any of the comments would reveal attorney-client privileged information.  Accordingly, in the absence of any evidence regarding the content of the illegible notes, the undersigned cannot conclude that the notes reveal any attorney-client privileged material or communications.  Thus, the undersigned determines that production of this document, absent evidence regarding privileged notes, did not waive any aspect of the attorney-client privilege.

### h.  Draft of Report to Inspector General

This document is, apparently, an e-mail from Brody to Christian containing a draft report to Catherine Leahy Scott at the Office of the State Inspector General, Dkt. No. 42 at 17.   Dkt. No. 41-11. This report contains a factual recitation of the alleged conflict of interest action and plaintiff's alleged act of transferring files from the DEC office to her personal computer.  It contains no legal assessment or opinion.  Although the information could have been used by the inspector general in reaching a legal conclusion,[14] the factual information in this document does not reveal any attorney-

---

[14]  The record reveals that there was no "report to or investigation by the inspector general."  Dkt. No. 41-12 at 2.

client privileged information.  The e-mail preceding the draft document also does not waive any attorney-client communications as the information contained therein does not contain legal advice.  Id. at 2.  This message simply indicates Brody's opinion that certain paragraphs could be considered nonessential in communicating the factual allegations to the IG's office.  Thus, the undersigned concludes that defendants have not waived any aspect of the attorney-client privilege by producing this email and draft memorandum.

### g. **August 20, 2014 Memo**

Defendants do not address this memo, Dkt. No. 41-13, which, apparently, was drafted by Brody.  Dkt. No. 41-1 at 15; Dkt. No. 42 at 17.  It is unclear to whom this memo is addressed or to what "document" it refers.  Brody has not yet been deposed. The plaintiff has not provided the Court with the questions she seeks to ask Brody in connection with this memo.  The memo recounts a conversation between Brody and plaintiff about a July 2 conversation, apparently about plaintiff's involvement in the Wandering Dago business.  Dkt. No. 41-13.  To the extent plaintiff wishes to question Brody on his July 2 conversation with plaintiff or his question "recommendation to Ed regarding the expansion of her participation in the Wandering Dago business," plaintiff may proceed with that line of questioning, as these communications are not privileged, nor do defendants claim as such.  Dkt. No. 41-13.  As the undersigned has no specific questions before it, and this memo does not reveal otherwise confidential legal advice, the undersigned is at a loss as to how this document discloses any attorney-client

46

privileged information to which defendants have claimed privilege.[15]

Accordingly, the undersigned concludes that production of the August 20, 2014 Brody memo does not waive the attorney-client privilege as it does not appear to contain any giving or receiving of legal advice.

### 3. Claim or Defense

Plaintiff argues that by raising the Mount Healthy defense, defendants have waived their right to assert attorney-client privilege because the defense puts the privileged information at issue. The Mount Healthy defense is an affirmative defense arising out of Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co v. White, 548 U.S. 53, 67 (2006). If a plaintiff demonstrates a prima facie retaliation claim, a defendant may assert the Mount Healthy defense, which requires the defendant to demonstrate "by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" Smith v. County of Suffolk, 776 F.3d 114, 119 (2d Cir. 2015) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). Thus, plaintiff argues that "Mount Healthy . . . puts at issue everything that Defendants' knew and believed about the alleged conflict of interest at the time they decided to terminate the Plaintiff, including any legal advice they had received." Dkt.

_____

[15] The only arguable legal opinion revealed in this memo is a belief that a "document" (again, which document is unknown to the court) is proof of plaintiff's knowledge of her impropriety. The undersigned does not know to which "document" the memo refers, or whether this document was produced to plaintiff. If it were withheld, the Court does not have the basis for the withholding before it. However, it would not appear that the document it refers to would create a privilege as it appears from the memo that this "document" is a summary of a conversation between plaintiff and Brody.

No. 41-1 at 6-7.

"It is well established that "the attorney-client privilege cannot at once be used as a shield and a sword." United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.1991) (citations omitted). "Accordingly, if a party places advice that it has received from an attorney 'at issue' in litigation, it has waived the privilege with respect to all such advice on the same topic." Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Alcoa S.S. Co., 232 F.R.D. 191, 198 (S.D.N.Y. 2005), adhered to in part on reconsideration sub nom. Am. Steamship Owners Mut. Protection & Indem. Ass'n, Inc. v. Alcoa S.S. Co., No. 04 CIV. 4309 (LAK/JCF), 2005 WL 2254463 (S.D.N.Y. Sept. 15, 2005). Examples of defenses that put an attorney's advice "at issue" is a defendant's advice of counsel defense and "when a plaintiff sues a former attorney for professional malpractice." Id. at 198-99 (citations omitted).[16] The Second Circuit has specified that in order to waive the attorney-client privilege, the party asserting the defense *must* have relied on privileged advice from counsel. In re County of Erie, 546 F.3d at 229.[17] However, the Second Circuit has also made clear that there is no bright-line rule in making this assessment: "[w]hether fairness requires disclosure has been decided . . . on a case-by-case basis, and depends primarily on the specific context in which the privilege

---

[16] The Second Circuit has noted that the qualified immunity defense is not one that waives the attorney-client privilege because it is an objective, rather than subjective, test. In re County of Erie, 546 F.3d at 229; but see McChesney v. Bastien, 9:10-CV-1409 (GTS/DEP), 2013 WL 4504459 (N.D.N.Y. Aug. 22, 2013) (determining that Second Circuit did not intend to conclude that reliance on advice of counsel could never support a qualified immunity defense).

[17] The Second Circuit "declined to specify or speculate as to what degree of reliance is required because Petitioners here do not rely upon the advice of counsel in the assertion of their defense in this action." In re County of Erie, 546 F.3d at 229.

is asserted." Id. (quoting In re Grand Jury, 219 F.3d at 183).

The parties provide no cases, nor did independent research reveal such a case, where a court held that asserting the Mount Healthy defense waives the attorney-client privilege. Thus, whether assertion of the Mount Healthy defense waives the attorney-client privilege appears to be an issue of first impression. Some courts, largely from outside of the Second Circuit, although not addressing the waiver issue, have generally indicated that the defendant's burden in the Mount Healthy defense takes into account the defendants' subjective motivation. See, e.g., Brannon v. Finkelstein, 754 F.3d 1269 (11th Cir. 2014) (citing Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008) ("This subjective motivation issue is addressed through the Mt. Healthy burden-shifting analysis[.]"); Rivera-Torres v. Ortiz Velez, 341 F.3d 86, 97 (1st Cir. 2003) (noting in employee's First Amendment retaliation suit that under Mount Healthy, "the employer's subjective motive is an essential element of the constitutional violation itself . . . ." and noting that subjective intent is relevant to qualified immunity analysis); Jinks v. Medlin, CV 313-068, 2015 WL 4716050, at *12-13 (S.D. Ga. Aug. 7, 2015) (noting that, "under the subjective motivation prong: '[O]nce the plaintiff has met his burden of establishing his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant . . . .' '[T]he question for the court under Mt. Healthy [becomes] whether a reasonable fact finder, a jury, would have to find that the defendants would have [taken the adverse action against plaintiff] 'even in the absence of the protected conduct.'"); Mazurek v. Wolcott Bd of Educ., 849 F. Supp 154 (D. Conn. 1994) (noting that a defendants' Mount Healthy defense "involves questions of

49

fact for a jury."); <u>Carranza v. Peters</u>, 1999 WL 515486, at *9 (N.D. Ill. E. Div. July 15, 1999) ("[T]he defendant's state of mind is relevant when, as here, intent is a component of the complained constitutional violation.") (citing <u>Mount Healthy</u>, 429 U.S. at 287); <u>Jermosen v. Coughlin</u>, 89-CV-1126E(M), 1993 WL 541688, at *2 (W.D.N.Y. Dec. 28, 1993) (referring to the defendant's burden in <u>Mt. Healthy</u> defense to demonstrate that 'the action would have been taken regardless of the invalid motivation" as a "state of mind factual issue.") (citation omitted)).

Although a defendant's state of mind or motivation may be a relevant factor in asserting the <u>Mount Healthy</u> defense, it does not necessarily follow that the defense puts the advice of counsel at issue. In order to determine that answer, it must be known whether the defendants relied on the advice of counsel in making their decision to terminate plaintiff. In contending that they would have terminated plaintiff even in the absence of her protected conduct, although *possible* that they relief on counsel's advice, reliance on counsel's advice is not necessarily required. Dkt. No. 12 at 5 ¶ 32. Thus, it is a close question whether, in proving that they would have terminated plaintiff even in absence of her protected conduct, they have placed attorney-client privileged communications "at issue." Certainly the record of documents parties have provided to the Court show that the defendants, specifically Brody, <u>see</u> dkt. nos. 41-8, 41-9, consulted with other attorneys, both within and outside of the DEC, in assessing whether plaintiff's alleged conduct violated certain rules and laws. To the extent defendants relied on advice of counsel in making to determination to terminate plaintiff, plaintiff may be correct that defendants would waive their privilege with respect to the

advice they actually considered and relied on in making the decision to terminate plaintiff. However, it first must be determined whether any defendant indicated that he or she relied on advice of counsel in making the termination decision. That question has not been asked of Conlon or Brody, and, as other defendants have not yet been deposed, that question has not been asked of them.

Accordingly, at this time, the undersigned refrains from determining whether assertion of the <u>Mount Healthy</u> defense waives any aspect of the attorney-client privilege with respect to advice defendants received. It is not until defendants are asked whether they relied on certain communications in making the decision to terminate plaintiff that the undersigned can assess whether that reliance puts attorney-client privileged advice "at issue."

## III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby

**ORDERED**, that plaintiff's motion to compel, Dkt. No. 41, is **GRANTED in part** insofar as:

(1) plaintiff is permitted to depose defendant Conlon in order to ask questions limited to the substance of the conversation that occurred at the October 2013 Bureau Chief's meeting; and,

(2) plaintiff is permitted to depose Lodico in order to ask questions limited to what was said at a late July 2014 meeting in regard to plaintiff's "ability to carry

out her responsibilities as the natural resources damages attorney"; and

(3) it is determined that defendants have waived the attorney-client privilege with relation to dkt. no. 41-8, Brody's memo regarding "confidential conversation with Shari Calnero."  This waiver extends only to conversations Brody had with Shari Calnero regarding whether plaintiff's conduct violated ethics laws; and it is

**ORDERED**, that plaintiff's motion to compel, Dkt. No. 41, is **DENIED in part** insofar as:

(1) Plaintiff seeks the Court to compel defendants to provide an unredacted version of dkt;. no. 41-8 or other documents relating to conversations between Brody and Calnero. These arguments are not properly before this Court as the undersigned has not been presented with a privilege log or specific requests and denials for documents; and

(2) plaintiff seeks for the limited depositions of Conlon and Lodico to be held at defendants' expense, such request is denied; and it is

**ORDERED**, that all other aspects of plaintiff's motion to compel are **DENIED**; and it is

**ORDERED**, that plaintiff's October 15, 2015 letter request, Dkt. No. 27, seeking identical relief to that sought in the motion to compel is **DENIED** except to the limited extent that the Court granted plaintiff's requests as encompassed within its review of the motion to compel; and it is

**ORDERED**, that the Clerk of the Court serve this Memorandum-Decision and Order on parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: August 25, 2016
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge