**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ANDREA D. LOGUIDICE,**

                                 **Plaintiff,**

        **v.**                                             **1:14-CV-1323**
                                                                     **(TJM/CFH)**

**EDWARD MCTIERNAN, et al.,**

                                 **Defendants.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**


**DECISION & ORDER**

      Before the Court is Defendants' motion for summary judgment in this case involving

Plaintiff's claim that Defendants violated her constitutional rights by firing her from her

position as an attorney with the New York State Department of Environmental

Conservation because she had pursued a lawsuit against the State. <u>See</u> dkt. # 82.

Plaintiff's lawsuit challenged denial of a permit a food truck in which Plaintiff had a

financial interest. The denial came, at least in part, because of the truck's name: "The

Wandering Dago." The parties have briefed the issues and the Court has determined to

decide the matter without oral argument.

**I.    BACKGROUND**

      Plaintiff is an attorney licensed to practice in New York. Defendants' Statement of

Material Facts ("Defendants' Statement"), dkt. # 82-1, at ¶ 1.[1]  At the times relevant to this lawsuit, Plaintiff was in a relationship with and resided with Brandon Snooks.  Id. at ¶ 2. Plaintiff had an ownership interest in Wandering Dago, Inc., a food truck that operated in the New York capital district.  Id. at ¶ 3.

Wandering Dago, Inc., commenced an action in the United States District Court for the Northern District of New York on August 27, 2013.  Id. at ¶ 4.  Wandering Dago sued the State of New York, New York State Office of General Services ("OGS"), four individuals employed by OGS, the New York Racing Association, Inc., Christopher Kay, and Stephen Travers.  Id. at 4; Plaintiff's Response to Defendants' Statement of Material Facts ("Plaintiff's Response"), dkt. # 85-1, at ¶ 4.  Plaintiff settled with the New York Racing Association, Kay, and Travers in January 2015.  Id.

The parties dispute the role that Plaintiff played in the Wandering Dago.  Compare Defendants' Statement at ¶ 5 to Plaintiff's Response at ¶ 5.  Defendants contend that Plaintiff took charge of "the business aspects of the business," which involved sending emails, social media posts, website development, bookkeeping, shopping, cleaning, and cooking.  Defendants' Statement at ¶ 5.  Plaintiff admits that she engaged in these tasks, but contends that Snooks shared the work with her.  Plaintiff's Response at ¶ 5.

The New York State Department of Environmental Conservation ("DEC") advertised a position for Natural Resources Damages ("NRD") Senior Attorney in DEC's Office of General Counsel ("OGC") in the fall of 2013.  Defendant's Statement at ¶ 6.  That position

---

[1]Both parties submitted the statement of material facts with citations to the record required by Local Rule 7.1(3).  The Court will cite to the Defendants' statement for facts which are undisputed and note where the parties disagree about a fact.

was a civil service position.  Id. at ¶ 7.  The candidates selected for interviews were candidates "reachable" on the civil service list.  Id.  Plaintiff applied for the job and was selected for an interview.  Id. at ¶ 8.

The parties disagree about who conducted the initial interview.  Defendants contend that Defendant Benjamin Condon and DEC attorney Andrew Gugliemi conducted the interview.  Defendants' Statement at ¶ 9.  Plaintiff insists that Christian Dowd was also part of the interview.  Id. at ¶ 9.  She also insists that the NRD position included working with the Division of Fish & Wildlife, the remediation departments, and Indian Nations.  Plaintiff's Response at ¶ 9.  Plaintiff also contends that the parties did not discuss specific cases on which Plaintiff would be working.  Id.

Conlon and Gugliemi recommended that plaintiff advance in the application process after the first interview.  Defendants' Statement at ¶ 10.  She should, they concluded, receive a second interview.  Id.  Defendants contend that Conlon and Deputy Counsel Thomas Berkman conducted Plaintiff's second interview, while Plaintiff insists that Guglielmi and McTiernan were also present.  Plaintiff's Response at ¶ 11.  She notes that she wrote McTiernan on October 22, 2013 to thank him for the opportunity to interview, and that Berkman phoned Plaintiff before October 28, 2013 and offered her the position.  Id.  She accepted.  Id.  During that second interview, Plaintiff did not mention any outside employment or her ownership of the food truck.  Defendants' Statement at ¶ 12.  Plaintiff contends that no one asked her any questions about outside employment.  Plaintiff's Response at ¶ 12.

Based on recommendations from Conlon and Berkman, as well as his review of Plaintiff's application, McTiernan endorsed hiring Plaintiff.  Defendants' Statement at ¶ 13.

3

He forwarded it to DEC's Office of Personnel so that Plaintiff could be offered a contingent position as a probationary employee in the NRD Senior Attorney position. Id.

The parties dispute whether Defendants made the decision to hire Plaintiff before or after they learned of her role with the food truck and in the Wandering Dago lawsuit. Defendants contend that they did not officially hire Plaintiff until after they learned of her connection to the lawsuit, while Plaintiff insists that evidence exists to show that Defendants had already hired her before they learned that she had sued the State of New York. Compare Defendants' Statement at ¶¶ 14-16; Plaintiff's Response at ¶¶ 14-16. The parties disagree about whether McTiernan and Conlon knew of the Wandering Dago lawsuit before various Bureau Chiefs informed them of the suit at an October 2013 meeting and suggested Plaintiff's involvement in it. Plaintiff claims contradictions exist between McTiernan's declaration and his deposition. See Plaintiff's Response at ¶ 15. While McTiernan claimed in his declaration that he heard of the lawsuit at the meeting or shortly thereafter, he testified in his deposition that he learned of Plaintiff's lawsuit "when 'some of the bureau chiefs approached [him] to tell [him] about it," informing him "'[t]hat we had hired or we had extended an offer to a potential provisional lawyer who had a lawsuit against the Office of General Services.'" Id. Likewise, Conlon stated at his deposition that he could not remember whether the meeting occurred before or after Plaintiff's hiring. Id. Christian testified that Maglienti had googled Plaintiff's name after seeing it on a list of candidates, and found out that she had been involved in the lawsuit. Id. Conlon testified that "'nobody that interviewed [Plaintiff] had picked up on'" her involvement in the lawsuit. Id. at ¶ 16.

Defendants point out that McTiernan and Conlon both claimed that their knowledge

4

about the lawsuit had no impact on their decision to hire the Plaintiff. Defendants' Statement at ¶¶ 17-18. Plaintiff responds by quoting portions of their depositions. McTiernan stated that "he 'certainly had no legal opinion. It was my impression that that should not be an impediment to her joining the department.'" Plaintiff's Response at ¶ 17. Conlon, Plaintiff points out, claimed "that he 'didn't see anything that as, you know, involving the food truck that was involving the ability or inability of somebody to do legal practice in relation to it. And that based on the interview process, we believe that Andrea was the best person for the job.'" Id. at ¶ 18.

Defendants claim that after the October 2013 Bureau Chiefs meeting but before Plaintiff started her work with DEC, McTiernan told Executive Deputy Commissioner Marc Gerstman that the attorney DEC had hired owned the Wandering Dago food truck. Defendants' Statement at ¶ 19. Plaintiff contends that the testimony on this subject was not as clear as Defendants claim. At his deposition, McTiernan stated that "'I don't remember informing anyone, but it's likely I apprised Marc Grestman, the executive deputy.'" Plaintiff's Response at ¶ 19. He later testified that he "'did not recall that discussion at all.'" Id. The parties dispute Grestman's reaction to hearing about Plaintiff's involvement with the Wandering Dago food truck. Defendants claim that Grestman did not object to hiring Plaintiff after learning of her involvement with the lawsuit. Defendants' Statement at ¶ 21. Plaintiff, citing deposition testimony, contends that Grestman could not recall whether he had an objection to Plaintiff's hiring, but testified that he thought McTiernan would have informed him of the hiring "because Grestman asked 'all of the executive staff to keep me apprized of any issues that may be notorious in the press' because he 'wanted to know what the agency was facing' and for that reason he 'would

5

have been concerned' about Loguidice's hiring." Plaitniff's Response at ¶ 21. The parties also dispute whether Philip Lodico and Deborah Christian were aware of the lawsuit at the time of Plaintiff's hiring. Defendants' Statement at ¶¶ 23-24; Plaintiff's Response at ¶¶ 23-24.

DEC Deputy Counsel Thomas Berkman offered Plaintiff a position as Natural Resources Damages Attorney in the OGC's Remediation Brueau on or about October 28, 2013. Defendants' Statement at ¶ 25. Plaintiff adds that she accepted the position, and that Berkman sent her a letter stating that "'we have offered, and you have accepted, the position of Senior Attorney (item 80136) in this agency's Office of General Counsel. As discussed, your start date is November 7, 2013. Congratulations on your appointment.'" Plaintiff's Response at ¶ 25. She starting working in that position on November 7, 2013. Defendants' Statement at ¶ 27.

Plaintiff received a contingent appointed position of Senior Attorney, effective November 7, 2013. Id. at ¶ 28. The letter of appointment notes that:

> As a contingent permanent employee, you must serve a probationary period of 26 to 52 weeks. This probationary period began on November 7, 2013. If your services are not satisfactory, your appointment may be terminated at any time duing the probationary period after the first eight weeks. Your probationary period will continue for the maximum period, unless you are advised to the contary.

Id. at ¶ 29.[2] Defendants claim that Plaintiff understood this language to mean that her was job was "probationary," and that the probationary period would last 52 weeks, unless Plaintiff was told that the period would be shortened. Id. at ¶ 30. Plaintiff claims she

_____

[2]Plaintiff correctly points out that Defendants' quotation of this language omits the word "permanent" from the phrase "contingent permanent employee" in the quoted language. See Plaintiff's Response at ¶ 29. The Court has supplied a corrected quotation.

understood the language to mean "'that if you performed your job satisfactorily beyond the 26- or 52-week period, you would then be a permanent employee.'" Plaintiff's Response at ¶ 30.  The parties agree that no one told Plaintiff her probationary period would be less than 52 weeks.  Id. at ¶ 31.  Plaintiff applied the same logic to the provision in the letter that stated she could be terminated if she did not meet standards after eight weeks on the job.  Compare Defendants' Statement at ¶ 32; Plaintiff's Response at ¶ 32.

Plaintiff received a copy of DEC's Conflict of Interest Policy at the time of her appointment.  Id. at ¶ 33.  The policy, as quoted by Defendants, states:

> The purpose of the DEC's Conflict of Interest Policy is to prevent conflict of interest situations from occurring as a result of private interests, outside employment or activities of employees outside of their official job capacity with the Department . . . (p. 1)
>
> [T]he public has a right to expect that the Department's employees will be objective and unbiased in carrying out their responsibilities.  This places an added burden or **responsibility upon Department employees to avoid actual, apparent, or potential conflicts of interest** in situations concerning outside activities.'" (p. 2.) (*emphasis added*) [emphasis added by Defendants; lack of open quotation mark in original].
>
> [A] Potential Conflict of Interest [is a] situation where a conflict *could* arise[, and an] Apparent Conflict of Interest [is a] situation where the public may reasonably perceive a conflict which does not necessarily exist (p. 2) (*emphasis in original*) [notation by Defendants].
>
> Failure to comply with the policy and/or laws of DEC and the State of New York may result in sanctions . . . [which may include] termination (p. 9).

Id. at ¶ 34.  Defendants claim that Plaintiff understood this policy to require her to get permission before engaging in outside employment.  Id. at ¶ 35.  Plaintiff responds that the DEC's ethics officer concluded that she did not need to obtain permission to continue the employment, since she began the outside activities before she started working for

DEC. Plaintiff's Response at ¶ 35.

DEC Ethics Counsel Stuart Brody met with Plaintiff on November 20, 2013. Defendants' Statement at ¶ 36. Defendants claim the purpose of the meeting was "to discuss the nature of her outside activities and counsel her with regard to the application of DEC's Conflict of Interest Policy and the Public Officers Law." Id. Plaintiff claims the meeting focused on the "food truck and the litigation," not any ethical issues. Plaintiff's Response at ¶ 36. She contends that Brody "gathered information" about the New York Racing Association's actions to force Wandering Dago to leave the Saratoga Race Track in summer 2013 because of the "'offensive nature of the Company name on the truck.'" Id. Brody also obtained information on OGS's decision to deny the company a permit. Id. He also questioned Plaintiff about her relationship with Brandon Snooks and her role with the company. Id. Plaintiff alleges that Brody asked her "why [Plaintiff] would sue the government if [she] wanted to get a job' with the government" Id. According to Plaintiff, Brody claimed that they "'were trying to get to a point where the relationship could work without the *distraction of a lawsuit and a provocative name*.'" Id. (emphasis added by Plaintiff).

At the meeting, Plaintiff told Brody that she and Snooks lived together and owned the business together. Defendants' Statement at ¶ 37. According to Defendants, Brody further explained to Plaintiff that employees were prohibited from "outside activities that raise a conflict or an appearance of conflict of interest with any regulatory function of DEC, or with entities with which DEC regularly interacts[.]" Id. at ¶ 38. Moreover, Brody allegedly told Plaintiff, her responsibilities to the people of New York required to her to

make sure "that her personal business does not overlap with any of the natural resources damages (NRD) matters which are part of her official duties." Id. Plaintiff disputes that the conversation covered these topics, insisting that Brody's interest was in her business and the litigation that surrounded it. Plaintiff's Response at ¶ 38. Defendants also contend that Brody provided counseling on the DEC's Outside Activities Policy, noting that the required inquiry into "'whether the proposed outside employment is in a position of high public visibility'" meant that the press coverage of the Wandering Dago lawsuit had "raised the profile of the fast food truck and made plaintiff's connection to it more publicly visible." Defendant's Statement at ¶ 39. Plaintiff counters that Brody found that she did not need permission to continue with an outside activity that began before she started her employment with DEC. Plaintiffs' Response at ¶ 39. She admits that Brody informed her that the litigation and the food truck represented "'a unique circumstance'" which required her to "'limit my involvement with the company, predominantly like public aspects of it. And it was explained to me that, you know, we just didn't want to draw attention to the DEC [and] it shouldn't become known that the owner of Wandering Dago was working at the DEC.'" Id.

Brody prepared a memorandum for McTiernan on or about November 28, 2013, that addressed Plaintiff's involvement with the food truck. Defendants' Statement at ¶ 40. Brody concluded that no conflict of interest presently existed, "'[i]n the absence of any foreseeable interactions between the company and Andrea's official duties[.]'" Id. Plaintiff points out that the memorandum included further discussion of requirements that Plaintiff

9

limit her public visibility in operating the food truck.  Plaintiff's Response at ¶ 40.[3]

McTiernan did not object to Plaintiff continuing to operate the food truck.  Defendants'

Statement at ¶ 41.  Plaintiff does not disagree, but argues that the restrictions that Brody

proposed were "onerous."  Plaintiff's Response at ¶ 41.  Plaintiff received Brody's

---

[3]The memorandum states:

As an attorney, she is subject to the Memorandum of April 26, 2012 entitled *Outside Employment Requiring Prior General Counsel Approval*.  The Memorandum requires that all outside activities of attorneys must be approved in advance, and sets out certain criteria applied to that approval process, including "whether the proposed outside employment is a position of high public visibility."

While nothing in the Public Officers Law requires that she curb her involvement with the public features of the Company, and the Memorandum appears to apply to employees contemplating outside employment, not job applicants already engaged in them, Andrea and I discussed at length the steps she might voluntarily undertake to minimize her public visibility with the Company, and consequentially, diminish the risk of subjecting the DEC (and the issue of employment with it) to controversy.

Accordingly, Andrea is willing, for the foreseeable future, to withdraw from all public aspects of Company business operations including retail delivery and distribution and marketing.  While retaining her position as President and principal stockholder, her activities would be confined to behind the scenes financial management.  Her name and photos would be removed from the website.  She would participate in the lawsuit as necessary to advance the case but refrain from any public comment on it.  Further, she will not make any reference to her DEC employment in any marketing information utilized by the Company, including social media.  This voluntary withdrawal from the more visible aspects of the Company is subject to adjustment as Andrea's need to actively participate in the Company, and the goal of maintaining low "public visibility" are, from time to time, revaluated. [sic] Further, in accordance with DEC policy regarding the conduct of outside activities, she will not use state equipment, including the telephone to conduct any business related to the company.

Moreover, I have counseled Andrea with regard to CP-7 Section 73 and 74 of the Public Officers law in order to anticipate any potential argument that Andrea's involvement with the Company, including the maintenance of a highly visible lawsuit and provocative business name, might interfere with or otherwise diminish her credibility as a public officer.

Exh. C to Declaration of Stuart Brody, dkt. # 82-4.

memorandum.  Defendants' Statement at ¶ 42.

The parties disagree about whether Plaintiff observed the restrictions set out in Brody's memorandum.  Defendant alleges that "[d]espite being advised that her closely held corporation should not engage in business with any entity regulated by the DEC, plaintiff took no steps to avoid such interactions.  Id. at ¶ 43.  Plaintiff does not address whether she engaged in any business with regulated entities, but she does contend that, "[a]s a result of her conversation with Brody, Plaintiff continued to shift responsibilities for the operation of the food truck to her business partner, Brandon Snooks[.]" Plaintiff's Response at ¶ 43.  She alleges that Snooks took over "pretty much all the daily activities of the company" and that she removed her name from "the automatic signature on Wandering Dago emails." Id.  Defendants further allege that Plaintiff did not inform Snooks "to avoid doing business with DEC regulated entities or discuss any precautions Wandering Dago should take to avoid creating a situation where its business overlapped with plaintiff's official DEC duties." Id. at ¶ 44.  Plaintiff claims that she informed Snooks that she would not do any work in the business once she started at DEC, and she "did not handle Wandering Dago's finances or social media, and did not discuss events or clients with Snooks." Plaintiff's Response at ¶ 44.  Plaintiff insists that she met the requirements outlined by Brody: she "ceased involvement in all aspects of the truck's public events to 'minimize the risk of subjecting the DEC (and the issue of employment with it) to controversy.'" Id.  Defendants also contend that Plaintiff did not discuss with Snooks  the need to avoid real, apparent, or potential conflicts of interest between the business and Plaintiff's DEC duties.  Defendants' Statement at ¶ 45.  Plaintiff disputes that she failed to

do so, but does not point to any specific statements or conduct that indicate she explained the need for avoiding such conflicts to Snooks.  Plaintiff's Response at ¶ 45.

DEC assigned Plaintiff to provide legal support on a number of matters for which the General Electric Company was the party from which DEC "intended to seek compensation for damages to natural resources."  Defendants' Statement at ¶ 46.  Plaintiff agrees that she worked on matters related to contamination of the Hudson River by General Electric.  Plaintiff's Response at ¶ 46.  She points out, however, that such work did not occupy the majority of her time at DEC.  Id.  She worked with the Division of Fish & Wildlife, remediation departments, and Indian nations.  Id.  The people who interviewed her for the job did not discuss specific assignments.  Id.

Conlon supervised Plaintiff when she worked at DEC.  Defendants' Statement at ¶ 47.  As an NRD attorney, Plaintiff's job was to recover damages from entities that caused damage to New York's natural resources.  Id. at ¶ 48.  The State uses the money recovered to remediate habitats harmed by the offenders' conduct.  Id. at ¶ 49.  Defendants contend that recovering damages related to cleanup of Polychlorinated Bi-Phenyls (PCBs) in the Hudson River represented "[b]y far the most significant NRD matter ever prosecuted by the department[.]"  Id. at ¶ 50.  General Electric was the primary party responsible for contaminating the Hudson River with PCBs.  Id. at ¶ 51.  General Electric's conduct represented more than half of the natural resource damages for which Plaintiff sought recovery.  Id. at ¶ 52.

Defendants allege that Plaintiff "had frequent and direct involvement" with these efforts to recover damages from General Electric."  Id. at ¶ 53.  Plaintiff disputes this claim, contending that "she never had any direct contact or correspondence with GE" and that

12

her work on the claim was "only [occasional][.]"  Plaintiff's Response at ¶ 53.  Plaintiff

contends that "she had little participation in the Hudson River cleanup[.]"  Id.  Andrew

Guglielmi took care of this matter, Plaintiff insists.  Id.  DEC's involvement with the Hudson

River was a subject in local and national media and a matter of interests to environmental

groups like Riverkeepers, Scenic Hudson, and the National Resources Defense Counsel.

Defendants' Statement at ¶ 54.

Plaintiff received a positive performance review from her supervisor, Bureau Chief

Ben Conlon, and her Unit Supervisor, Andrew Guglielmi, on or about May 29, 2014.  Id. at

¶ 55.  Conlon and Guglielmi met with Plaintiff to review the evaluation on May 29, 2014.

Id. at ¶ 56.  At that meeting, Conlon told Plaintiff he was pleased with her performance.

Id. at ¶ 57.  Defendants assert that Conlon did have complaints about Plaintiff participating

in "office gossip," but chose to address the matter at the meeting rather than to place the

issue in the written evaluation.  Id. at ¶ 58.  Defendants contend that Conlon did so

"because he valued plaintiff as an employee and hoped that she would correct this

behavior without the need to officially document it as a deficiency on her evaluation."  Id.

Plaintiff acknowledges that Conlon complained in general about office gossip, but

contends that he never stated or suggested that her "social contacts" merited official

documentation.  Plaintiff's Response at ¶ 58.

Conlon also informed Plaintiff that he could not shorten her probationary period

from 52 weeks.  Defendants' Statement at ¶ 59.  He explained that shortening a

probationary period was "extremely rare."  Id.  Plaintiff stated that she hoped to shorten

that period because "'since the day I started, [ ], I've always been concerned about the

litigation I'm involved with.'"  Id. at ¶ 60.

Defendants contend that Conlon told Plaintiff that DEC was not concerned about the food-truck litigation.  Id. at ¶ 61.  They assert that he told Plaintiff that he "was aware of the litigation when you were hired," as was Guglielmi.  Id.  "It's been discussed," he told her, "and it is as far as I'm concerned not an issue unless you become directly involved in the legal work related to that."  Id.  Plaintiff responds by pointing to evidence she contends demonstrates that Conlon was unaware of the litigation at the time of her hiring, but learned of it only at a bureau chief's meeting.  Plaintiff's Response at ¶ 61.

Defendants contend that on July 1, 2014, Wandering Dago, Inc. signed a contract to cater lunch at General Electric Headquarters at One Research Circle, Nickayuna, New York.  Defendant's Statement at ¶ 62.  The lunch was scheduled for July 9, 2014.  Id. Plaintiff contends that the contract was with Holly McAlpine of Wind River, and did not mention General Electric.  Plaintiff's Response at ¶ 62.  She contends that she was not involved in and not even aware of the event until July 14, 2014, when Conlon and Lodico informed her about it in a meeting.  Id.  Wandering Dago provided a lunch on July 9, 2014. Defendants' Statement at ¶ 63.  The parties dispute whether Wandering Dago provided the lunch for General Electric or Wind River employees.  Compare Defendants' Statement at ¶ 63 and Plaintiff's Response at ¶ 63.

Though the parties dispute how Conlon came to learn of Wandering Dago's catering of the event, Conlon became concerned that Plaintiff's business' involvement at an event that involved General Electric "had created an appearance of impropriety and violated DEC's Conflict of Interest Policy."  Defendants' Statement at ¶¶ 64-66; Plaintiff's Response at ¶¶ 64-65.  Plaintiff disputes that there was any reason for concern about a conflict of interest.  Plaintiff's Response at ¶ 66.  Conlon informed McTiernan that

14

Wandering Dago had catered a lunchtime event at the General Electric facility in Niskayuna. Defendants' Statement at ¶ 68. McTiernan asked Conlon and Philip Lodico, an attorney in the Office of the General Counsel, to speak to Plaintiff about the issue. Id. at ¶ 69.

Plaintiff denied knowing about the event when she met with Conlon and Lodico on July 14, 2014. Id. at ¶ 70. Neither Conlon nor Lodico found the denial believable. Id. Defendants contend that after this meeting Plaintiff stopped focusing on her NRD work but instead spent her time attempting to rally coworkers to defend her. Defendants' Statement at ¶ 72. Defendants contend that "she had stopped handling" much of her work "because it involved GE[.]" Id. Plaintiff denies this statement, arguing that "she never had any direct contact or correspondence" with the company, and had not done much work on matters involving General Electric. Plaintiff's Response at ¶ 72. She also denies that evidence of any disruptive conduct exists. Id.

McTiernan contends that he concluded that the event at General Electric represented either Plaintiff's bad judgment or her lack of control over her outside employment, or perhaps both. Defendants' Statement at ¶ 73. Plaintiff, he concluded, "had created a difficult situation," by failing to avoid potential conflicts or interest or appearances of impropriety. Id. McTiernan informed Gerstman of the event shortly thereafter. Id. at ¶ 74.

On August 5, 2014, McTiernan sent an email to DEC Personnel Director Agnew informing him that "it is necessary" to terminate the Plaintiff. Id. at ¶ 76. McTiernan cited Plaintiff's outside activities, which he contended had "created the appearance of a conflict of interest." Id. Agnew approved Plaintiff's termination. Id. at ¶ 77. He advised that

15

Plaintiff's supervisor would need to prepare a final evaluation that recommended termination.  Id.  Conlon learned that Plaintiff was being terminated that day, and was assigned to provide a final performance evaluation.  Id. at ¶ 78.  The Personnel Office drafted two letters, one advising of the termination and the other acknowledging Plaintiff's resignation.  Id. at ¶ 79.  McTiernan and Christian gave Plaintiff the choice of resigning or being fired that same day.  Id. at ¶ 80.  On August 12, 2014, counsel for Plaintiff informed DEC that she would not resign.  Id. at ¶ 83.  DEC terminated Plaintiff's employment effective August 13, 2014.  Id. at ¶ 84.

Plaintiff filed a Complaint in this action on October 29, 2014.  See dkt. # 1.  Count 1, brought pursuant to 42 U.S.C. § 1983, alleges that Defendants violated Plaintiff's First Amendment rights by retaliating against her for her speech on a public matter.  Count 2, also brought pursuant to Section 1983, alleges that Defendants violated Plaintiff's right to petition the government by retaliating against her for filing a claim in Court.  Counts 3 and 4 are the same claims brought under New York law.

The parties engaged in discovery.  At the end of the discovery period, Defendants filed the instant motion.  The parties have briefed the motion and the matter is now ripe for decision.

## II.     LEGAL STANDARD

Defendants have filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary

judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the movant is able to establish a *prima facie* basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Evidence must exist to support each element of the non-movant's claim; "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements are immaterial and cannot defeat a motion for summary judgment." Salhuddin v. Goord, 467 F.3d 263, 281 (2d Cir. 2006).

## III.    DISCUSSION

Though Plaintiff raises four separate claims, and Defendants seek judgment and dismissal of the entire case, both sides argue only that the question in this case is whether evidence supports Plaintiff's claim of First Amendment retaliation. The parties thus appear to agree that the same standard covers each of Plaintiff's claims. The Court will therefore address all claims using the same standards.

### A.    First Amendment Retaliation

Plaintiff contends that she was fired for exercising her First Amendment rights while she was employed by DEC. "'To survive a motion for summary judgment on a First Amendment retaliation claim' in the public employment context, 'the plaintiff must present evidence which shows '[1] that the speech at issue was protected, [2] that [s]he suffered an adverse employment action, and [3] that there was a causal connection between the protected speech and the adverse employment action.'" Nagle v. Marron, 663 F.3d 100, 105 (2d Cir. 2011) (quoting Cotarelo v. Vill. of Sleepy Hollow Police Dept., 460 F.3d 247, 251 (2d Cir. 2006)). "'To demonstrate a causal connection a plaintiff must show that the protected sppech [or conduct] was a substantial motivating factor in the adverse action.'" Kiernan v. Town of Southampton, 734 Fed. Appx. 37, 42 (2d Cir. 2018) (quoting Smith v. County of Suffolk, 776 F.3d 114, 118 (2d Cir. 2015)). Once the plaintiff presents such evidence, "the defendant has an opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of protected conduct.'" Id. (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)).

The Court concludes that the dispositive question here is whether Plaintiff, in filing suit when regulators denied her food truck access to public venues, spoke on a matter of public concern. Plaintiff certainly suffered an adverse employment action, since

18

Defendants terminated her from her NRD Attorney position. Plaintiff has produced sufficient evidence to support her claim in this respect.

A reasonable juror could also conclude that Plaintiff's speech was a substantial motivating factor in her termination. While, as explained above, the parties vigorously dispute the meaning and existence of the evidence of that causation, the Court finds that a question of fact exists on that issue. "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Morris, 196 F.3d at 110. "Summary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." Id.

Circumstantial evidence exists to support Plaintiff's claim. A reasonable juror could conclude that Defendants were not aware of Plaintiff's lawsuit when they hired her. That same juror could conclude that when Plaintiff's supervisors learned of her involvement in a lawsuit against the State of New York, they began to have second thoughts about her employment and began to place restrictions on her participation in the food-truck business that did not apply to other workers. Plaintiff's counseling session with Brody could, for such a juror, be evidence that DEC saw her involvement with the business as problematic, and also that the Agency sought a way to force Plaintiff to abandon her speech or abandon her job. Plaintiff's supervisors allegedly imposed restrictions on her that Defendants' own experts did not agree were necessary. These restrictions, a juror could find, provided a pretext to fire her when she continued to operate her business. When Plaintiff still continued to pursue her lawsuit, a reasonable juror could conclude,

Defendants mischaracterized the catered luncheon as a pretext to terminate her. While an equally reasonable juror could conclude that DEC simply enforced its rules on conflicts in terminating Plaintiff, a question of fact exists as to the reasons for the termination, and summary judgment is not appropriate on that basis.[4]

The question for the Court here is whether Plaintiff spoke on a matter of public concern. Since this is a question of law, the Court must determine whether the evidence supports a finding that Plaintiff has made out the first element of her prima facie case.

"The Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). "The First Amendment limits the ability of a public employer to leverage the employment relationship

---

[4]Courts have described three ways to show causation in the First Amendment retaliation context: "showing either (1) the retaliatory action occurred close in time to the protected activities; (2) disparate treatment of similarly situated employees or (3) direct proof of retaliatory animus against the plaitniff." Gilligan v. Town of Moreau, No. 00-7109, 2000 U.S. Appx. LEXIS 27198 at *8 (2d Cir. Oct. 25, 2000). Plaintiff does not offer an argument about temporal proximity, but does argue that she has sufficient evidence to demonstrate that Defendants treated Plaintiff differently from other similarly situated employees in firing her for an alleged conflict of interest. Evidence of such disparate treatment can also support a First Amendment retaliation claim. See Sumner v. U.S. Postal Service, 203, 209 (2d Cir. 1990) (causation in Title VII retaliation claim can be supported by "evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus."); Figueroa v. Weisenfreund, 255 Fed. Appx. 595, 597 (2d Cir. 2007) (applying that standard to First Amendment retaliation claim)). Plaintiff points to a number of other DEC employees she claims were similarly situated and did not experience similar discipline for their outside activities. The Defendants dispute that these individuals are similarly situated and treated differently than Plaintiff. The Court finds a question of fact exists in this area as well, as there are questions about the timing of Defendants' knowledge of Plaintiff's activities, the nature of the restrictions on Plaintiff and others, and the similarity of the comparator's activities.

to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens." Id. at 419. "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." Id.

"Whether public employee speech is protected from retaliation under the First Amendment entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.'" Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (quoting Garcetti, 547 U.S. at 418). "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999). A court is to "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Id. at 163-64.

"'To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" Gorman v. Rensselaer Cty., 910 F.3d 40, 45 (2d Cir. 2018)(quoting Jackler v. Byrne, 658 F.3d 225, 236 (2d Cir. 2011)). If the "speech . . . 'primarily concerns an issue that is personal in nature and generally related to the speaker's own situation, such as his or her assignments, promotion, or salary'" then the speech "'does not address matters of public concern.'" Id. (quoting Jackler, 658 F.3d at 236). The speech in question might "[hint] at some broader public purpose[,]" but "retaliation against the airing

of generally personal grievances is not brought within the protection of the First Amendment by 'the mere fact that one or two of [a public employee's] comments could be construed broadly to implicate matters of public concern.'" Ruotolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008) (quoting Ezekwo v. New York City Health & Hosp. Corp., 940 F.2d 775, 781 (2d Cir. 1991)).   As such "'[a] public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way institutions are run.'" Id. (quoting Boyce v. Andrew, 510 F.3d 1333, 1343 (11th Cir. 2007)).   "The speaker's motive is a factor to consider but 'is not dispositive in determining whether his speech addresses a matter of public concern.'" Golodner v. Berliner, 770 F.3d 196, 202 (2d Cir. 2014) (quoting Sousa v. Roque, 578 F.3d 164, 173 (2d Cir. 2009)).

The Court finds that the Plaintiff spoke on a matter of public concern when she filed and continued to litigate her suit against regulators who denied her permits to operate the Wandering Dago food truck.  The parties have not pointed the Court to any cases where a public employee began her speech while a private citizen, continued the matter as a public employee, and then suffered an adverse employment action allegedly motivated by her speech while working as a public employee.  The Court has likewise not discovered such a case.  The Court concludes that Plaintiff spoke as a private citizen when she filed her lawsuit.  There can be no doubt as to that fact, since she was not a public employee at that point. Even as she continued to litigate the matter after she became a public employee, she continued to speak on matters unrelated to her public employment.  See, e.g., City of San Diego v. Rose, 543 U.S. 77, 82 (2004) ("the Court has held that when government employees speak or write on their own time on topics unrelated to their

employment, the speech can have First Amendment protection, absent some governmental justification 'far stronger than mere speculation' in regulating it.") (quoting United States v. Treasury Employees, 513 U.S. 454, 465 (1995)).  Moreover, Plaintiff's speech raised an element of public concern when she argued that the government's regulation of her speech limited her First Amendment rights, even if she sought a permit to operate a business.  See, e.g., Matal v. Tam, 137 (2017) (rock band improperly denied trademark for racially sensitive name because a provision in trademark law prohibiting registration for marks that "'disparage . . . or bring . . . into contemp[t] or disrepute' any 'persons, living or dead' . . . offends a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend.") (quoting 15 U.S.C. § 1052(a)).  The Plaintiff's speech also addressed an issue that gained public interest and notoriety.  Under those circumstances, the Court concludes that Plaintiff spoke on a matter of public concern.

The Court therefore finds that Plaintiff spoke on a matter of public concern, and that questions of fact exist as to whether Defendants terminated Plaintiff's employment in retaliation for that speech.  As such, the Defendants' motion will be denied.

## IV.     CONCLUSION

For the reasons stated above, the Court Defendants' motion for summary judgment, dkt. # 82, is hereby DENIED.


**IT IS SO ORDERED.**

Dated: September 5, 2019

Thomas J. McAvoy
Senior, U.S. District Judge